Jane DOE, Plaintiff–Appellant,

v.

The FIRST NATIONAL BANK OF CHICAGO, Defendant–Appellee.

No. 87–2473.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1988.

Decided Jan. 12, 1989.

COFFEY, Circuit Judge.

This dispute arose when defendant-appellee, First National Bank of Chicago ("FNBC"), terminated the employment of plaintiff-appellant, Jane Doe (a pseudonym, hereinafter "Jane"). Jane believed that FNBC fired her when FNBC became aware of the fact that she had an abortion while in FNBC's employment. She sued FNBC in federal district court, alleging that her discharge constituted impermissible discrimination based on gender, contrary to Title VII, as amended by the Pregnancy Discrimination Act of 1978. *See* 42 U.S.C. §§ 2000e(k), 2000e–2(a)(1). Jane also alleged, as a pendent claim under Illinois law, that her discharge constituted a breach of contract. The district judge dismissed Jane's contract claim prior to trial, holding that an FNBC employment memorandum on which she rested her contract claim could not, as a matter of law, be construed as a binding contract of employment. *See Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987) (an employment manual may constitute a binding contract of employment only in limited circumstances). After a ten-day bench trial, the court ruled in favor of FNBC on the Title VII claim, finding that Jane had failed to bear the burden of demonstrating that FNBC discharged her because of the abortion. Jane appeals the district court's Title VII and contract rulings. We affirm.

I.

The parties agree that FNBC hired Jane as a legal assistant in its probate department on August 8, 1983. Jane had an abortion on Friday, January 4, 1985, and was terminated effective January 7, 1985. The parties agree on little else.

When FNBC hired Jane, it classified her as a Legal Assistant III, in the grade eight salary bracket. Jane had prior experience as a paralegal and was thus qualified to begin service as a Legal Assistant II, with a pay grade of nine. However, FNBC had posted the opening at the grade eight rank and salary and, under its hiring policies,

David M. Mattenson, Kanter & Mattenson Ltd., Chicago, Ill., for plaintiff-appellant.

Lynn A. Goldstein, The First Nat. Bank of Chicago, Chicago, Ill., for defendant-appellee.

Before POSNER, COFFEY, and FLAUM, Circuit Judges.

was not allowed to offer Jane the pay grade nine position without re-advertising the opening. Jane agreed to begin service as a Legal Assistant III, with the understanding that she would advance to the higher classification and salary grade in the near or not too distant future.

FNBC hired Jane as an assistant to Mary Roe (also a pseudonym, hereinafter "Mary"), a trust officer and probate administrator. Jane's duties included collecting estate assets, preparing investment reviews of assets and liabilities, and making various payments and disbursements from estate accounts. Jane's direct supervisor was Mary, but she was also indirectly supervised by Richard Roe (another pseudonym, hereinafter "Richard"), FNBC's probate department office manager. Richard testified that he only had an opportunity to observe "a small portion of [Jane's] performance," and "did not see the items she was given on a daily basis." Thus, evidence concerning Jane's work performance primarily consisted of observations made by Mary.

When Jane was hired, FNBC required her to sign a memorandum explaining FNBC's standards for its employees' work performance and personal conduct (the "employee memorandum"). The employee memorandum, which provided the foundation for Jane's breach of contract action, notified FNBC's new employees that:

"We think it is also important that you be aware of the standards of performance and personal conduct that are expected of all employees at FCC/FNBC. We believe that providing you with these rules now will reduce the possibility of your inadvertently not meeting these basic standards of conduct.

"The rules outlined below should be reviewed carefully. If you have any questions about them, we encourage you to discuss them thoroughly with your immediate supervisor. It is also possible that there will be more specific rules which pertain to your individual work unit. These will be discussed with you directly by your supervisor."

The employee memorandum then listed two classifications of employee misconduct, "major offenses" and "minor offenses." According to the memorandum, commission of a major offense "is cause for immediate dismissal," while commission of a minor offense provides cause for "disciplinary action." At trial, FNBC maintained that it discharged Jane for a major offense: "Performing job assignments in a grossly negligent manner which results in significant loss of Corporate or customer assets or significant embarrassment to the Corporation." Jane disagreed, contending that the alleged errors FNBC considered in its discharge decision constituted only minor offenses.

In addition to the employee memorandum FNBC also published a more detailed "policy manual." The 254 page policy manual explained a broad range of FNBC employee concerns, including pay and benefits; job evaluations; and most important to the problem before us, provided more specific disciplinary and termination procedures for both major and minor offenses. Jane did not cite the policy manual as a part of the contract she alleges FNBC breached. Instead, in Count II of her amended complaint, she specifically contended that the employee memorandum constituted the agreement between the parties, and she relied on no other document or agreement.

Once hired (on August 8, 1983), Jane began the ninety-day probationary period required of new FNBC employees. Jane was retained for full time employment after completing the probationary period. Later, on February 16, 1984, FNBC gave Jane a six-month performance evaluation that concluded that Jane's work "consistently met position requirements/objectives." Some two and a half months thereafter, on May 7, 1984, FNBC promoted Jane to the position of Legal Assistant II and raised her pay to grade nine. Jane interprets these events as clear evidence that her work satisfied FNBC standards during her early months with the bank. FNBC disagrees. The record provides some support for both interpretations.

Jane argues that FNBC clearly considered her a good employee, or it would not have retained and promoted her. For example, Jane cites Richard's testimony regarding her six-month evaluation. Richard testified that he considered the evaluation report to be "a pretty good recommendation." Similarly, Mary testified that Jane had done a "terrific job" during the last six weeks of the six-month evaluation period. Moreover, Jane's raise and promotion was an exception to FNBC's general rule that a full year of service was required before advancement.[1] Richard wrote a memorandum in support of Jane's promotion, describing her as "bright, congenial, a good worker, and the type of person who is willing to handle more difficult and complex responsibilities." Richard also commended Jane for her communication skills and her attention to detail. (As we will discuss below, Jane's attention or inattention to detail became very important to the disposition of this case.)

FNBC agrees that it decided to retain Jane after her probationary period, but disagrees that this implies that Jane's work was particularly good. Mary testified that Jane was often inattentive to detail and took excessively long lunch breaks during the probationary period, according to Mary, she (Mary) warned Jane about the long lunch breaks and had doubts about retaining Jane. However, Mary attributed Jane's problems to personal difficulties and decided to keep her because she demonstrated the potential of becoming a good employee.

FNBC also contends that Jane's six-month evaluation does not imply that her work record was particularly strong, because there were problems with her work habits not reflected in the written report. FNBC introduced evidence that Jane failed to make a tax payment for an estate, requiring FNBC not only to pay a penalty but also interest. Richard testified that Mary brought this matter to his attention, and that he had also received complaints that Jane made too many personal telephone calls and was absent from her desk an inordinate amount of time. Because Mary had on previous occasions given Jane informal verbal warnings about her performance (the first step in FNBC's disciplinary and discharge policy), Richard issued Jane a formal verbal warning on December 21, 1983 (the second step in the disciplinary process). Richard also told Jane that she would be given a final, written warning if her work did not improve within two weeks. After the formal warning, Jane's work improved dramatically. Based on that turnaround, Mary and Richard gave Jane the positive six-month probationary period evaluation discussed above. However, FNBC points out that the evaluation report was not unqualified, for in fact it noted Jane's occasional inattention to detail. FNBC thus characterizes the overall evaluation as, at best, "average."

FNBC also contests Jane's claim that her promotion and raise necessarily imply a strong endorsement of the quality of Jane's work. Richard testified that the promotion simply indicates that FNBC was willing to make good on its earlier promise to elevate Jane to the position for which she was originally qualified. Thus, the promotion was spurred by the administrative efficiency gained in avoiding re-advertising the position by hiring Jane at the originally posted position and then advancing her to the position for which she was qualified. FNBC contends that the promotion, and the six-month review, when considered in the context of Jane's absences from her desk, errors in assignments, excessive telephone use, long lunch breaks and general inattention to detail, demonstrate only that Jane's work was adequate at that particular time, not that it was particularly good.

FNBC also asserts that it issued Jane another formal, verbal warning regarding the poor quality of her work performance on March 14, 1984, between her six-month evaluation and her raise. Mary testified that Jane's performance deteriorated after Jane received her six-month evaluation.

---

1. However, this "promotion" simply implemented the parties' understanding reached at the time of Jane's hiring, that she would receive an early advancement to salary grade nine in order that they might avoid the necessity of readvertising the position prior to Jane's hiring.

Mary claimed that she noticed instances of inattention to detail similar to those which had triggered Jane's earlier formal verbal warning—inaccurate preparation of reviews of estate assets and liabilities and failures to check account balances before drawing checks, thus causing overdrafts. Mary testified that she told Richard about the problems and that, as a result, Richard issued Jane a second formal verbal warning. Richard testified that Jane's March 16, 1984 warning was based on excessive personal telephone calls and general "inattention to detail." Jane conceded that she received a warning in March 1984, but insisted that the warning was merely informal and related only to excessive personal telephone calls. However, based upon the record, the district court found that in this warning Jane was "told she was making too many mistakes in her work."

The period from March 1984 to December 1984 was relatively uneventful. Jane was not the subject of any formal warnings and Mary testified that Jane made only occasional mistakes during this time frame. She was advised of the mistakes and admonished to be more careful. In Mary's opinion, Jane's mistakes coincided with her personal problems.

The critical events in this case occurred in December 1984 and January 1985. In mid-December Jane made the first error FNBC specifically relied upon as a basis for her termination. Jane was instructed to draw three checks distributing over one million dollars from an estate the bank was administering. Jane drew the checks from the estate's account rather than a trust account, thereby creating an overdraft in excess of $850,000 in the estate account, and Jane also failed to verify the estate account balance prior to issuing the checks. Jane admits the overdraft, but claims her supervisors approved these actions. However, testimony reflects that such approval serves only an audit function and does not reflect a supervisory determination that sufficient funds exist in the account from which checks are drawn. Jane attempted to rectify this error by transferring funds from the trust account to cover the overdraft in the estate account. However, the amount Jane attempted to transfer from the trust account was too large and would have resulted in an overdraft in the trust account if Mary had not intervened to stop the procedure. Mary was concerned because Jane's error would appear on bank statements received by attorneys as well as others concerned with the administration of the estate.

Jane and Mary were both scheduled for vacations later in December 1984. Mary was to be on vacation from December 24 to December 27, while Jane was to be on vacation from December 28 to January 3. On December 21, 1984, prior to Mary's departure, Mary asked Jane to complete several important tasks before Jane left for her vacation. These tasks were preparing and mailing letters to a post office for the purpose of ensuring that a decedent's mail was forwarded to FNBC, proofreading a list of safe deposit box contents relevant to that same estate, creating an unpriced list of that estate's assets and preparing and mailing distribution checks for two other estates.

On December 26, 1984, Jane called Mary, vacationing in Michigan. The parties agree that Jane informed Mary that she was pregnant, was considering an abortion and desired time off from work. Jane then asked Mary which of the tasks assigned her were necessary to complete before taking her leave. Mary replied that all of them were important.

The parties are in complete disagreement regarding the rest of the conversation. Jane testified that Mary told her not to have an abortion, and that abortion is murder and she (Jane) would regret having done it. In support of her position, Jane testified that, in a previous conversation, Mary had expressed anti-abortion sentiments. Jane also asserted that the facts that Mary is Catholic and had taken a "Sex and Marriage" class at a Catholic university indicated that Mary opposed abortion. Jane also offered the testimony of her former boyfriend which she contends corroborated her description of the conversation. Mary, on the other hand, testified that she offered aid and comfort to Jane, made none

of the statements about abortion Jane attributed to her and agreed not to mention this matter to anyone else at the bank. Mary's position was supported by her testimony denying that she had expressed anti-abortion sentiments in conversations with Jane, stating her own pro-abortion philosophy and pointing out her membership in NOW, the well-known feminist organization which takes a pro-abortion stance.

The district court discussed this credibility question in a detailed fashion.[2] The court refused to believe Jane's assertion that Mary had previously expressed an anti-abortion position, noting that it is unlikely that Jane would have confided in Mary on this subject if she knew that Mary strongly opposed abortion. The court also did not believe that the evidence concerning Mary's religious background and educational experiences was sufficient for it to conclude that Mary was so opposed to abortion that she would "deliberately injure" Jane. The court further discounted the testimony of Jane's former boyfriend. The court doubted that the boyfriend would have discussed Jane's abortion with Mary, if he had knowledge of Mary's supposedly strong opposition to abortion. Further, the judge felt that the boyfriend's demeanor as a witness "did not evoke a strong feeling of veracity." Additionally, the trial court questioned the motives of an individual who refused to marry a woman after she became pregnant.[3]

Mary returned to work on December 28, 1984, and, upon her return, discovered that none of the tasks she had assigned to Jane had been completed in a satisfactory manner. The proofreading of the safety deposit box list had not been completed. Jane asserts that this failure resulted because the list had not been typed at the time Jane left for vacation. However, Jane failed to introduce evidence that would tend to substantiate a finding that Mary had knowledge of Jane's explanation. In addition, no list of unappraised assets had been prepared. Since Jane claims that she was waiting for appraisals, an unnecessary step for an unappraised list, she may have misunderstood the assignment. Again, however, there is no evidence that Mary was made aware of this explanation. Mary felt that Jane's failure to satisfactorily prepare either list left Mary unprepared for her December 28 meeting with the individuals concerned with the estate in question. To compound difficulties, Mary also found that the letters to the post office regarding the estate were never mailed. While Jane contends that mailing these letters was another person's job, the district court found that Mary had told Jane to mail these letters. It was, thus, her responsibility. Similarly, Mary also found the distribution checks pertaining to the other two estates were prepared but not mailed. Again Jane raises the question of whether or not there was a misunderstanding concerning what was required, since Jane testified she had been told only to "cut" the checks. However, the district court adopted Mary's position that Jane was told to send the checks and there is no evidence to show that Mary was aware of Jane's interpretation that she was only to "cut" the checks. Mary was concerned about the effect this delay had on FNBC's obligation to keep estate assets invested.

As a result of discovering Jane's failure to complete these tasks as directed and in a satisfactory manner, Mary's anger was exacerbated. She decided that something needed to be done and determined that she would see Richard Roe, upon his December 31 return from vacation, and ask that action be taken. At this point Mary knew that Jane was contemplating an abortion, but had not been informed that Jane had undergone an abortion.

On December 31, 1984, Mary testified that she told Richard of Jane's work performance problems and suggested a final

---

2. This determination is found both in the Memorandum Opinion of the district court issued on June 30, 1987, *Doe v. First National Bank*, 668 F.Supp. 1110 (N.D.Ill.1987), and in the Findings of Fact and Conclusions of Law the court subsequently issued.

3. The boyfriend's testimony indicated that he had been engaged to marry Jane and that the relationship had gone awry.

written warning. Richard stated that Mary and he discussed Jane's failure to complete the tasks Mary assigned to Jane prior to Jane's vacation and about the overdraft Jane was responsible for in mid-December. They agreed that a final written warning was in order. Mary did not tell Richard about Jane's contemplated abortion and Richard did not learn of this abortion until January 11, 1985.

On January 4, 1985, the day Jane was supposed to return to work, Mary received a call from Jane's boyfriend stating that Jane had undergone an abortion and would not be at work. Later on that day two additional problems with Jane's job performance came to Mary's attention. The widower of a decedent called Mary and stated that he had been overreimbursed $1,400 as a result of a mistake Jane had made in addition. The widower returned the overpayment. Mary felt this mistake hurt the bank's image, while Jane labelled it trivial. Mary also received a telephone call from the Exchange National Bank stating that Jane had written a letter to Exchange misclassifying a disabled individual as deceased, while FNBC was acting in the capacity of her appointed guardian. This letter had caused Exchange to freeze the woman's assets. Mary recounted each of these job related errors to Richard, but did not mention Jane's abortion. Richard stated he would include both of these errors in the memo he was writing to the personnel department.

Richard then delivered a handwritten memo to the Employee Relations department for review. Richard testified that a person named Brenda from personnel said that personnel had determined that the problems Richard enumerated were sufficient to warrant Jane's termination. Brenda was unable to remember this conversation and appeared to exhibit a generally weak memory during most of her testimony. The district court found that Richard had been told by the personnel department that "Jane's conduct constituted gross neg-

ligence, a major offense under First Chicago's disciplinary policy, for which her employment could be immediately suspended," and that "[b]ased on that advice, Richard decided to suspend Jane and initiate the procedures necessary for approval of her termination." These procedures involved seeking approval through the bank's management hierarchy.

On January 7, 1985, Jane returned to work. Mary asked her how it (the abortion) went. At some point in the day Richard called Jane into his office. He informed Jane that she was suspended pending termination and read a list of work-related violations.

On the next day, January 8, 1985, Jane complained by telephone to FNBC Employment Relations Specialist, Karen Johnson.[4] Jane, owning up to the fact that she had made mistakes, felt that some of the mistakes were not her fault and that other employees who had made similar errors had not been terminated. During this telephone call Jane made no mention of her abortion.

Later on January 8, 1985, FNBC received a letter from Jane's attorney stating that because Jane had been terminated on account of her abortion she was contemplating legal action.[5]

On January 10, 1985, Richard Roe, who had still not been informed of Jane's abortion, had his memorandum requesting termination typed and also signed the personnel data form FNBC used in the employee termination procedure. The memorandum and form were submitted to two bank officers for approval. These officers were also unaware of Jane's abortion at the time they signed the form approving the termination.

On January 11, 1985, a meeting was held between Richard, Mary and members of FNBC's personnel department. At that meeting Richard learned for the first time that Jane had procured an abortion. It was determined that the termination would

---

**4.** During a suspension pending termination FNBC engages in "fact gathering," during which time an employee may raise issues concerning the fairness of termination.  ... . .. .

**5.** This is the first notice anyone at FNBC, other than Mary, had received of Jane's abortion.

.

proceed in spite of Jane's abortion. There was some discussion of Jane's training, experience and background for her position, and Richard stated that her prior training, experience and background were adequate. Richard was told to revise his memorandum with respect to the questions of training, experience and background and to date the memorandum January 7, 1985. No revisions were made in the memorandum concerning the events precipitating Jane's suspension.

On January 15, 1985, Jane was advised that she had been terminated effective January 7, 1985.

During trial, evidence was introduced by both parties concerning a female Asian employee who had made an overdistribution in an estate. This employee was not terminated, but instead received a lower evaluation as a result of the error. The employee was in a different position than Jane, in that she was a long-term employee with an exemplary employment record and was also very upset and concerned about having caused the error. In view of her long tenure and strong performance record, her supervisor decided that no disciplinary action was required other than the lowering of her performance review.

The district court in its memorandum opinion and its subsequent findings of fact and conclusions of law, stated that in order to establish a prima facie case in a matter of this nature an employee must demonstrate that she: "(1) was meeting her employer's legitimate job-performance expectations, (2) had an abortion ... (3) was terminated ... (4) the person or persons responsible for her termination possessed animus toward abortion and (5) knew of her abortion." *Doe v. First National Bank*, No. 85 C 3742, Findings of Fact and Conclusions of Law at 20 (N.D.Ill. August 14, 1987). *See also Doe v. First National Bank*, 668 F.Supp. 1110, 1113 (N.D.Ill.1987) (substantially identical language). The court determined that Jane had failed to establish that she was meeting the employ-

er's expectations, that the persons responsible for Jane's termination knew of Jane's abortion or that these persons possessed animus toward abortion. Moreover, the court found that FNBC had articulated a legitimate, non-discriminatory basis for Jane's termination by its showing that "Jane's work performance during the last days before her discharge was so poor that it was in blatant disregard for the best interests of First Chicago." *Doe*, Findings of Fact and Conclusions of Law at 24. *See also Doe*, 668 F.Supp. at 1116–17 (substantially identical language). Jane failed to establish that the reason enumerated above was a pretext for discrimination or that FNBC discriminated against her because the preponderance of the evidence demonstrated that those who authorized Jane's termination did so based upon her job performance without any knowledge of or animus toward her abortion. In addition, treatment of other employees, alleged failure to follow disciplinary procedures, and revision of the termination memorandum were insufficient to demonstrate that the employer's reasons for its actions, which were based upon its exercise of its business judgment, were pretexts for discrimination.

## II.

Jane contends that FNBC breached an express contract of employment when it failed to honor its alleged promises to follow specific guidelines for the discipline and discharge of its employees. Jane contends that the employee memorandum she signed when she began work at FNBC guaranteed that she could not be fired unless she either committed a major offense or was afforded the benefit of a specific set of procedures outlined in the bank's policy manual. Jane asserts that under Illinois law (that the parties agree governs this case),[6] the employee memorandum and policy manual create an enforceable contract that FNBC breached by firing her immediately for what were, at most, minor offenses. *See Duldulao v. St. Mary of Naz-*

6. When the parties agree on choice of law, we need not address the issue further. *See, e.g., SNACI, S.R.L. v. Illinois Foundation Seeds, Inc.,*

830 F.2d 90, 92 n. 1 (7th Cir.1987); *Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 n. 2 (7th Cir.1987).

*areth Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987). Jane urges that the district court erred as a matter of law in ruling against her on the contract claim.

In determining whether the district court properly dismissed Jane's contract claim, we note that under Federal Rule of Civil Procedure 12(b)(6) " '[a] complaint should be dismissed for failure to state a claim only if appears beyond doubt that the plaintiff is unable to prove any set of facts that would entitle the plaintiff to relief.' " *Andrews v. Consolidated Rail Corp.*, 831 F.2d 678, 682 (7th Cir.1987) (quoting *Doe v. St. Joseph's Hospital of Fort Wayne*, 788 F.2d 411, 414 (7th Cir.1986)).

■ In deciding the question of whether Jane could establish facts sufficient to entitle her to relief, we observe that under Illinois law, an employee handbook or similar policy statement by an employer may create enforceable, contractual rights. However, such rights may be created only if all of the traditional elements of contract formation are present.

"First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for promises contained in the statement, and under traditional principles a valid contract is formed."

*Duldulao*, 115 Ill.2d at 490, 106 Ill.Dec. at 12, 505 N.E.2d at 318. If any one of these elements is absent, no express contract has been formed, and the relationship is merely one of "employment-at-will." 115 Ill.2d at 489, 106 Ill.Dec. at 11, 505 N.E.2d at 317.

■ A comparison of the employee handbook contents involved in *Duldulao* and the language in the FNBC employee memorandum demonstrates that the FNBC memorandum falls far short of creating a contract. In *Duldulao*, the employee handbook clearly stated that "permanent employees '*are never* dismissed without prior written admonitions and/or an investigation that has been properly documented' ... and that 'three warning notices within a twelve-month period *are required* before an employee is dismissed.' " 115 Ill.2d at 491, 106 Ill.Dec. at 12, 505 N.E.2d at 318 (emphasis in court's decision). Because the language was clearly mandatory, the Illinois Supreme Court found that the handbook created enforceable rights. 115 Ill.2d at 491, 106 Ill.Dec. at 12–13, 505 N.E.2d at 318–19. Other Illinois courts have also held that an employee handbook or similar document creates enforceable contractual rights only when specific procedures have been prescribed by positive and mandatory language. *See, e.g., DeFosse v. Cherry Electrical Products Corp.*, 156 Ill.App.3d 1030, 1034–35, 109 Ill.Dec. 520, 523–24, 510 N.E.2d 141, 144–45 (1987); *Land v. Michael Reese Hospital & Medical Center*, 153 Ill.App.3d 465, 467, 106 Ill.Dec. 470, 472, 505 N.E.2d 1261, 1263 (1987); *Free v. Holy Cross Hospital*, 153 Ill.App.3d 45, 49, 106 Ill.Dec. 397, 397–98, 505 N.E.2d 1188, 1188–89 (1987).

The FNBC employee memorandum contains none of the clear, promissory language that the court relied upon when finding an enforceable contract in *Duldulao*. The letter is informational in tone, describing major and minor offenses, but contains no description of specific disciplinary procedures. The memorandum provides that employees may be disciplined or discharged for listed misconduct, but it does not purport to promise that specific disciplinary procedures will be used. The language of the FNBC employee memorandum thus falls short of the requirements of *Duldulao*, 115 Ill.2d at 490–91, 106 Ill.Dec. at 12–13, 505 N.E.2d at 318–19.

■ Jane attempts to supplement the employee memorandum by incorporating the FNBC policy manual into her argument. The policy manual does provide a specific disciplinary procedure for FNBC

employees, but the policy manual does not support Jane's breach of contract claim for two reasons. Initially, we must point out that Jane failed to attach the policy manual (or any part of it) to the complaint containing her contract claim, but did attach it to the separate complaint containing her Title VII claim. Because a motion to dismiss must be decided on the face of the complaint, including materials appended as exhibits, and the policy manual was not made part of the contract claim complaint, the policy manual was not available to the district court judge. The manual, thus, could not be considered by the judge and we may not consider it on review. *Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 198 (7th Cir.1985); *Powe v. City of Chicago*, 664 F.2d 639, 642 (7th Cir.1981). Furthermore, even if the policy manual was properly made part of the record, it could not constitute a contract under *Duldulao*. The policy manual to which Jane refers contains the following explicit disclaimer:

> "Supervisors are expected to adhere to the guidelines in this document for the efficient and consistent operation of First Chicago Corporation (FCC's) personnel policies. *Neither this policy nor any other provision of this policy manual is intended to set forth the terms and conditions of an individual's employment or termination of employment, to constitute a contract of employment, or to confer any additional employment rights. Employment can be terminated at any time and for any reason by either the employee or FCC.*"

(Emphasis added). We fail to see how a document which clearly disclaims in unambiguous language any purpose to bind the parties can constitute "a promise clear enough that an employee would reasonably believe that an offer has been made." *Duldulao*, 115 Ill.2d at 490, 106 Ill.Dec. at 12, 505 N.E.2d at 318. Thus, the policy manual cannot, as a matter of law, support a contract under *Duldulao*.

In sum, neither the employee memorandum nor the policy manual on which Jane relies is sufficiently promissory in nature to create enforceable rights under Illinois law. *See, e.g., Duldulao*, 115 Ill.2d at 489–

91, 106 Ill.Dec. at 11–13, 505 N.E.2d at 317–19; *DeFosse*, 156 Ill.App.3d at 1034–35, 109 Ill.Dec. at 523–24, 510 N.E.2d at 144–45; *Land*, 153 Ill.App.3d at 467, 106 Ill.Dec. at 472, 505 N.E.2d at 1263; *Free*, 153 Ill.App.3d at 49, 106 Ill.Dec. at 397–98, 505 N.E.2d at 1188–89. The district court's judgment dismissing Jane's contract claim is affirmed.

## III.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex or national origin...." 42 U.S.C. § 2000e–2(a)(1). In 1978, Congress passed the Pregnancy Discrimination Act of 1978, which provides that Title VII's ban on gender-based discrimination includes discrimination "because of or on the basis of pregnancy, child birth, or related medical conditions...." 42 U.S.C. § 2000e(k). Assuming without having to decide that discrimination on account of abortion is actionable under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), the district judge did not commit clear error in finding that Jane Doe was not fired because she had an abortion.

Jane initially challenges the district court's exposition of the elements of the prima facie case. As noted previously, the judge employed a modified version of the familiar *McDonnell–Douglas* criteria in this case and Jane objects to the modification. *See McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (elements of prima facie case of discriminatory hiring). We need not resolve this issue as it is well settled that "[a]fter a trial on the merits 'disputes about the prima facie case fall away.'" *Kier v. Commercial Union Insurance Cos.*, 808 F.2d 1254, 1257 (7th Cir.1987) (quoting *Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 480 (7th Cir.1986)). *See also United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 713–15, 103 S.Ct. 1478, 1480–82, 75 L.Ed.2d 403 (1983). Thus, "[w]e need resolve only the ultimate ques-

tion of whether there was sufficient evidence for a [factfinder] to conclude that [sex] was a determinative factor in [Jane's] discharge." *Kier*, 808 F.2d at 1257.

In resolving this question we note that the United States Supreme Court has held that:

"Because a finding of intentional discrimination is a finding of fact, the standard governing appellate review of a district court's finding of discrimination is that set forth in Federal Rule of Civil Procedure 52(a): 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' "

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed. 2d 518 (1985).

In reviewing whether or not the district court's finding of an absence of intentional discrimination was clearly erroneous, we are mindful of the following language from the Supreme Court's decision in *Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511–12:

"Although the meaning of the phrase 'clearly erroneous' is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles ... is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*' *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." [7]

Where findings of the trial court, as in the matter before us, are based in fairly significant part upon credibility determinations, the care with which we review such findings is heightened:

"When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent

---

7. We recognized the final point in this quotation recently in *Andre v. Bendix Corp. (Andre II)*, 841 F.2d 172, 176 (7th Cir.1988), in which we observed that:

"There are at least two plausible views of the evidence in this case. In light of our opinion in *Andre I*, [774 F.2d 786 (7th Cir.1985) ] we cannot say that the district court's finding that Bendix did not intentionally discriminate

against Andre was clearly erroneous. The district court stated that it had a 'hunch' that the hostility Andre experienced was based on her sex, but it concluded that there was simply not enough evidence to corroborate that hunch. We cannot say that this conclusion was clearly erroneous."

(Citations omitted).

or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."

*Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512 (citations omitted).

We have expressed some concern about cases like this one, in which the trial court adopts findings of fact prepared by a party to litigation, based upon our recognition that "where a district court adopts a party's proposed findings of fact wholesale or verbatim, the resulting findings are 'not the original product of a disinterested mind.'" *Andre v. Bendix Corp. (Andre I),* 774 F.2d 786, 800 (7th Cir.1985) (quoting *Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir.1977)). This concern is tempered in this case because the district court issued a memorandum opinion independently resolving the major factual and legal issues prior to requesting the defendants to prepare for the court's adoption "suitable Findings of Fact and Conclusions of Law ... *to accord with the findings and legal determinations of this court in this memorandum of opinion.*" *Doe v. First National Bank,* 668 F.Supp. 1110, 1117 (N.D.Ill.1987) (emphasis added). Moreover, "[t]his circuit has no rule prohibiting a district court from adopting findings substantially or entirely as proposed by one party," *Andre I,* 774 F.2d at 800, and the Supreme Court has emphasized that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson,* 470 U.S. at 572, 105 S.Ct. at 1510. While in such cases "'we examine the findings especially critically when deciding whether they are clearly erroneous,'" *Andre I,* 774 F.2d at 800 (quoting *Coates v. Johnson & John-*

*son,* 756 F.2d 524, 533 n. 7 (7th Cir.1985)), "our concern ... is not so much with the manner in which the district court adopted the proposed findings, as with the *adequacy* of the findings which resulted from this adoption." *Andre I,* 774 F.2d at 800 (emphasis in original).

Because one of the purposes of findings of fact is to "'aid review by affording a clear understanding of the ground or basis of the [district court's] decision,'" *Id.* (quoting *Wattleton v. International Brotherhood of Boiler Makers, Local No. 1509,* 686 F.2d 586, 591 (7th Cir.1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1199, 75 L.Ed.2d 442 (1983)), adequacy of the findings "'necessitates that the findings of fact on the merits include as many of the subsidiary facts as are necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.'" *Andre I,* 774 F.2d at 801 (quoting *Denofre v. Transportation Insurance Rating Bureau,* 532 F.2d 43, 45 (7th Cir.1976) (per curiam)). "The ultimate inquiry in a Title VII disparate treatment claim is whether discriminatory intent was a 'but for' cause of the adverse action." *Germane v. Heckler,* 804 F.2d 366, 368 (7th Cir.1986). Thus, "[o]nce a Title VII trial has progressed to the ultimate issue—whose explanation of motive to believe—'the only subsidiary finding necessary [under Rule 52(a)] is what facts persuade the court to prefer one party's version.'" *Andre I,* 774 F.2d at 801 (quoting *Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 136 (7th Cir. 1985)).

■ In this case Jane's version is that Mary, an anti-abortion advocate, instigated Jane's termination in retaliation against Jane's contemplated abortion and that the job-related reasons asserted for her termination were mere pretexts for this supposed discrimination. FNBC's version is that Mary had no motivation to take any action against Jane based upon her contemplated abortion, no one else at FNBC knew of the abortion until the procedures carrying out Jane's termination had reached an advanced stage and thus Jane's termination

was based wholly upon legitimate, job-related grounds. The district court chose to believe FNBC's version of its motivation in terminating Jane.

The initial and perhaps critical fact which persuaded the court to prefer FNBC's position over Jane's was the court's credibility-based resolution of the issue of the content of the December 26, 1984, conversation between Mary and Jane and its closely associated determination of the question of Mary's motivation to take action against Jane on the basis of the abortion Jane was contemplating at that time. In choosing to believe Mary's testimony concerning these issues rather than the directly contradictory testimony offered by Jane and her former boyfriend, the district court made a detailed credibility determination fully discussed *supra.* Our review of Mary's testimony confirms that she presented a "coherent and facially plausible story that is not contradicted by extrinsic evidence." *Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512. Thus, the trial judge's determinations concerning the content of the December 26 conversation and Mary's motivations in instigating Jane's termination were not clearly erroneous.

The trial judge's finding that Mary lacked motivation to retaliate against Jane on the basis of her abortion means that there is virtually nothing in the record to support Jane's version of the facts relating to FNBC's intent. Following Mary's December 31, 1984, conversation with Richard Roe regarding Jane's work-related problems, the record reflects both that Richard was the individual largely responsible for carrying out Jane's termination and that Richard was unaware of Jane's abortion until after he had prepared a su' stantially final draft of the termination memorandum and the personnel data form which were the means utilized in carrying out the termination. In addition, no one at the bank other than Mary was aware of Jane's abortion until after Jane had been given her final suspension pending termination. Mary's lack of motivation to instigate Jane's termination based upon Jane's abortion, the involvement of other supervisory personnel in the termination decision and the lack of knowledge these decisionmakers had of Jane's abortion at the time they made termination decisions, all make it most obvious that Jane's termination was not precipitated by her abortion. Accordingly, the trial court's finding that those responsible for Jane's termination, other than Mary, made their original termination decisions without knowledge of Jane's abortion is certainly not clearly erroneous.

Furthermore, the trial court could properly find that Jane Doe's work performance during the period just prior to "her discharge was so poor that it was in blatant disregard for the best interests of First Chicago." *Doe,* Findings of Fact and Conclusions of Law at 24 (N.D.Ill. August 14, 1987) *See also Doe,* 668 F.Supp. at 1116–17 (substantially identical language). In examining questions concerning an employee's job performance

"[t]his Court will not ... delve into the question of which portrayal is the correct one. This Court does not sit as a super-personnel department that reexamines an entity's business decisions. The question is not whether the [employer] exercised prudent business judgment, but whether [the employee] has come forward to refute the articulated, legitimate reasons for his discharge. In this regard, [the employee] must do more than challenge the judgment of his superiors through his own self-interested assertions. '[The employee's] perception of himself, however, is not relevant. It is the perception of the decision maker which is relevant.' *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980)."

*Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464–65 (7th Cir.1986) (citations omitted). The district court could properly find that supervisors at FNBC perceived that Jane was not fulfilling her job responsibilities in December 1984 and January 1985 based upon her frequent mistakes including her overdraft, her failure to complete the assigned tasks prior to leaving for vacation, her error in the letter to the Exchange Bank and her overreimbursement of the widower of a decedent. While the record permits inferences that Jane may possibly

have misunderstood some of the details of certain assignments and may have had explanations for some of her actions, those who made the termination decision do not appear from the record to have been aware of many of these misunderstandings and explanations at the time they made their decision. Further, the number of problems occurring at one time, as well as their relation to concerns about "inattention to detail" noted earlier in Jane's tenure, necessitate the conclusion that the district court's findings concerning Jane's job performance and the role it played in the discharge decision were not clearly erroneous.

■ The district court also appears to have properly treated the evidence concerning the alleged instance of differential treatment of another employee. That employee, a female, was not discharged when she made an overdistribution to the beneficiaries of an estate. However, the district court found that this employee was treated differently because of her long tenure, generally strong employment record, the isolated nature of this error and the employee's regret about the mistake. These findings were supported in the record, adequately differentiate this employee from Jane and were not clearly erroneous.

In addition, the district court's findings regarding the absence of a "cover up" of the alleged abortion-related reasons for Jane's termination appear proper. The court again noted that much of the action necessary for the termination had been completed prior to notice of Jane's abortion being received by anyone at FNBC other than Mary. Moreover, the changes made in the termination memorandum following notice of the abortion did not revise the description of the employment misadventures at FNBC that precipitated Jane's termination. Thus, the district court's determination that the Bank did not seek to "cover up" abortion-related reasons for Jane's termination was free from clear error.

During the lengthy ten-day trial the district judge made statements reflecting a lack of knowledge concerning NOW and the identity of a former vice-presidential candidate. However, from the record we cannot be certain if he was acting in jest or actually was unaware of these matters. The trial judge also may have crossed the lines of good taste in his examination of Jane's boyfriend concerning the details of their living arrangements as well as the frequency of their acts of sexual relations. While this conduct is questionable, we are convinced that these remarks, statements and questions were not in any way relevant to the factual findings material to the resolution of this case. The district court's factual findings in this case were not clearly erroneous as they have support in the record and adequately explained why the district court accepted FNBC's version of its motivation for termination rather than the version offered by Jane. Accordingly, the trial judge did not commit clear error in his ultimate factual determination that FNBC did not intentionally discriminate against Jane on the basis of sex when it terminated her. The judgment of the district court is

AFFIRMED.