Sharon J. DAUGHHETEE, Plaintiff,

v.

AMAX COAL COMPANY, A DIVISION OF AMAX, INC., Defendant.

No. TH 83–253–C.

United States District Court,
S.D. Indiana,
Terre Haute Division.

May 7, 1990.

Terry Noffsinger and Catherine A. Behrens, Noffsinger Price & Bradley, Evansville, Ind., for plaintiff.

G. Daniel Kelley, Jr., Byron L. Myers, Martin J. Klaper, Ice Miller Donadio & Ryan, Indianapolis, Ind., for defendant.

## MEMORANDUM

BROOKS, Chief Judge.

### I. INTRODUCTION TO CASE

Sharon Daughhetee filed her original Complaint with this Court on October 17, 1983. Subsequently, on January 14, 1985, she filed her Amended Complaint. In that Complaint she included five (5) separate Counts, all arising from her employment with and eventual termination from the employ of defendant, AMAX, Inc. The plaintiff alleges that:

1. AMAX intentionally violated Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et seq. by discriminating against the plaintiff due to her sex.

2. Defendants, Crow, Smith, Vanzo, Hirsch, Pyle, McDowell, Nelson & Teeters, as individuals and as co-employees of AMAX, conspired to deprive the plaintiff of the equal protection and/or equal privileges and immunities of the law due to her sex, in violation of 42 U.S.C. § 1985(3).

3. AMAX and plaintiff entered into an employment contract which defendant breached.

4. AMAX breached a covenant of good faith and fair dealing by discharging the plaintiff.

5. AMAX wrongfully discharged plaintiff because she refused to violate state and federal law.

On January 14, 1988 summary judgment was granted as to Counts II–V and denied as to Count I. Accordingly, a trial was conducted on Count I of the plaintiff's Amended Complaint, the Title VII claim. Having conducted the trial and acting as the finder of fact, the Court makes the following findings of fact and conclusions of law.

### II. APPLICABLE LAW

This Court has jurisdiction over this cause pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 2000e–5. 42 U.S.C. 2000e–2(a) reads:

Employer practices. It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

It is well established that a plaintiff may pursue Title VII claims under either a disparate treatment or disparate impact theory. The plaintiff herein is claiming that her treatment while employed with AMAX and subsequent discharge were discriminatory, in violation of Title VII, under a disparate treatment theory.

The defendant devoted a substantial amount of its post trial brief arguing that the plaintiff failed to establish a prima facie case as set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff responded by arguing that she did meet the *McDonnell Douglas* burden at trial. However, the Court does not find an examination into this issue necessary. This Court is not considering a Rule 12(b)

dismissal or a Rule 56 summary judgment. A trial on the merits has been conducted and prior to trial it had been determined that the plaintiff met her burden and that the defendant had articulated its legitimate reason for her discharge. This analysis was part of the summary judgment decision of January 14, 1988 and does not need to be conducted again. "After a trial on the merits disputes about the prima facie case fall away." *Jane Doe v. The First National Bank of Chicago*, 865 F.2d 864, 873, citing *Kier v. Commercial Union Insurance Cos.*, 808 F.2d 1254, 1257 (7th Cir.1987) [additional cites omitted].

The plaintiff in *Kier* brought his Complaint under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and the court stated that after a trial on the merits that it "need resolve only the ultimate question of whether there was sufficient evidence for a jury to conclude that age was a determinative factor in Kier's discharge." Likewise, the issue herein is whether the plaintiff was discharged, or suffered other unfair treatment, due to her sex. What *McDonnell Douglas* does tell us in regards to trials of Title VII cases is that the plaintiff bears the burden of persuading the trier of fact that the defendants' articulated reason was not the true reason for the actions complained of by the plaintiff.

Justice Blackmun, concurring in *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 717–18, 103 S.Ct. 1478, 1482–83, 75 L.Ed.2d 403 (1983), stated:

> This ultimate burden may be met in one of two ways. First, as the Court notes, a plaintiff may persuade the Court that the employment decision more likely than not was motivated by a discriminatory reason.... In addition, however, this burden is also carried if the plaintiff shows "that the employer's proffered explanation is unworthy of credence. [cites omitted]

## III. FACTS OF THE CASE

Plaintiff began working for AMAX in June, 1977 as a mine clerk at the Minne-haha mine in Sullivan County, Indiana. As a mine clerk the plaintiff's duties were largely clerical. In this position she worked directly for Homer Wright who was the superintendent of the mine, the highest managerial position in the mine.

On October 1, 1978 the plaintiff was promoted from mine clerk to a newly created position, Drilling and Blasting Administrator. The plaintiff was the only female salaried employee of the mine. Homer Wright recommended the plaintiff for this position. With this promotion, the plaintiff experienced a raise in pay from Eleven Thousand Sixteen Dollars ($11,016.00) to Sixteen Thousand Seven Hundred Dollars ($16,-700.00) yearly. As a Drilling and Blasting Administrator the plaintiff was responsible for maintaining explosives records, among other duties. One set of documents that plaintiff had charge of were the "shot" or "dot" sheets. Dot sheets are prepared in the field and record important information about blasting charges, including the location of charges and the timing of their detonation.

During 1979 AMAX began reorganizing its operations. As part of the reorganization it eliminated some positions, changed the title or duties of others and transferred personnel between cities. The following changes occurred at the Minnehaha Mine: Tom Daugherty was transferred from the Indianapolis office to the Minnehaha Mine and assumed the position of Engineering Manager; Earl Webb became the Production Manager, Ron Like became Senior Drilling and Blasting Supervisor and was later replaced by John Smith in October, 1980; and Charles Crowe became the Mine Manager, the highest managerial position at the Mine.[1] As the Drilling & Blasting Administrator, and prior to 1981, the plaintiff was directly supervised by Webb. But, in 1981 the plaintiff's position was changed so that it became part of the Engineering Department. That change was not made so that the plaintiff would be under the supervision of one of the co-conspirators, rather the defendant's reasons are more

---

1. This position had been known as Mine Super-intendent prior to the reorganization.

believable. That is, the job duties were so similar to the functions of the Engineering Department that the change was made for efficiency reasons. Larry Pile was an attorney for AMAX at the time of plaintiff's employment. Subsequently, Lonnie Nelson replaced Daugherty as Engineering Manager.

In 1982 AMAX decided that a reduction in force was necessary at its operations, including the Minnehaha Mine. This was the result of a decrease in business. The Minnehaha Mine reduced its operation from a 3–pit/4–dragline to a 2–pit/2–dragline during this time. Tom Daugherty recommended that the plaintiff, as well as ninety-eight (98) other hourly and salaried employees, be laid off on July 28, 1982. Eventually, AMAX reduced its employees from its 1982 figure of three hundred nineteen (319) to one hundred fifty (150) in 1988. The plaintiff's position was eliminated at all the defendant's mines. Larry Goldman testified that the plaintiff's duties were split among several employees after she was laid off. In 1978 AMAX had a total of ten (10) or (11) mines in the Midwest and over three thousand seven hundred (3,700) employees. Today, AMAX has four (4) surface and one (1) underground mines with approximately two thousand (2,000) employees. There is no question that AMAX underwent a reduction in force. The issue is whether the plaintiff was discriminated against while employed with AMAX and whether the decision to lay her off, rather than other male employees, was motivated by her sex and not a legitimate business reason.

The plaintiff alleges the following:

1. That she was treated differently than AMAX's male employees, specifically, that she was not compensated equally.

2. That her working conditions were not adequate and were poorer in quality than those of male employees.

3. That she was treated differently than male employees in ways that worked to her detriment.

4. That she was permanently laid off due to her sex.

5. That defendant refuses to give her a good recommendation for employment due to her sex.

The Court will address each allegation below:

■ First, plaintiff claims that she did not receive equal salary and benefits. Yet, the evidence was that by virtue of one review she received an eight percent (8%) pay increase. The plaintiff claims that had she been a male her increase would have been greater. There is no evidence to support this contention. Further, the plaintiff was promoted from mine clerk, a clerical position, to drilling and blasting administrator. That resulted in a significant raise from Eleven Thousand Sixteen Dollars ($11,016.00) to Sixteen Thousand Seven Hundred Dollars ($16,700.00).

■ The plaintiff also claims that she was expected to complete more work than male employees. Plaintiff attempts to prove this claim by showing that she was behind in her work due to the increased workload created by John Smith after he became her supervisor and by showing that she was not allowed to work evenings or over her vacation. The record does show that she was not behind in her work until after Smith arrived and that he changed some office procedures thereby increasing the time it took plaintiff to do her job. However, the Court does not find that these changes occurred to discriminate against the plaintiff, rather the changes were a managerial decision made for a legitimate purpose. Smith, among others in management, was concerned about the accuracy and completeness of plaintiff's records. Whether or not his decision to change the record keeping was a good one isn't for this Court to decide. The issue is whether he had a discriminatory motive for the decision. I believe not.

In regards to her working more hours, Crowe testified that salaried personnel were expected to work more hours than hourly employees. Further, while the new record keeping policy of Smith may have increased the plaintiff's work the Court does not believe this was done to her because of her sex. Finally, plaintiff com-

plains that she was not permitted to work on Saturdays or over her vacation, while male employees were allowed to do so. Daugherty testified that only essential jobs were allowed to work over vacations and on Saturdays and that the decision to not allow the plaintiff to work at those times, while others were allowed, was based on necessity, not sex. The Court believes this account. Crowe testified that it was generally company policy to not permit employees to work on Saturdays or vacations.

█ The plaintiff's second allegation is that she was provided poor working conditions. She claims that she was placed in a small, unpaneled and isolated room due to her sex. Initially, the plaintiff shared space with the purchasing department. She was eventually moved to the welding department area. However, the plaintiff also testified that while she occupied the office without paneling four (4) men also were without paneling. Cheryl Culler, an engineer at the mine, testified that she was involved in designing the plaintiff's office and that no discriminatory motive was involved. In fact, Culler chose to occupy the office after plaintiff was laid off. The plaintiff also claimed that the heat in the office was inconsistent and was used to make her uncomfortable. Culler testified that the office had radiant heat and that was the cause of the variation of temperature in the office. The Court accepts this account. Finally, the Court believes that the plaintiff's request to renovate the office was denied for financial reasons.

█ The plaintiff's third allegation is that she was treated differently and unequally from the male employees. Specifically, plaintiff complains about her work evaluations, an incident report and the imposition of two rules which required her to keep a daily log and to receive permission from a supervisor before leaving the job-site.

The Court does not find that the evaluations which gave the plaintiff a below standard rating were motivated by a discriminatory motive. Plaintiff points to her above standard evaluations to show that she was a good employee and that the below standard evaluations did not reflect her work performance. Although, Homer Wright's evaluation and assessment of the plaintiff at trial are suspect as he testified that he was dating her while she was under his supervision. Further, the less than standard evaluations (Bohannon & Nelson evaluations) occurred at a time that the plaintiff was behind in her work. This is also the reason for the incident report. Daugherty testified that the plaintiff was six (6) to eight (8) weeks behind in her work at one time during 1980. This is a legitimate reason for the poor evaluations and written reprimand.

█ After Smith came on he required plaintiff to keep a log of her daily activities. The log was to account for every fifteen (15) minute period. Smith testified that this was a "common management tool" used to assess and increase productivity. The plaintiff was to keep the log for one (1) week at which time Smith was to review the record in an attempt to determine what changes, if any, were necessary to increase productivity. However, the plaintiff had such a negative attitude toward keeping the log that the plan was unsuccessful. Although the plaintiff did not enjoy keeping the log it was not required of her due to her sex.

█ Plaintiff was also required to receive the approval of a supervisor before leaving the mine. The evidence proved that this rule was imposed because her supervisors often couldn't locate her. This rule was reasonable and not motivated by a discriminatory intent. Finally, the Court notes that the defendant offered and plaintiff turned down an opportunity to be trained for a supervisory position.

█ The plaintiff also claims that she was permanently laid off due to her sex. The reasons stated previously for the incident report and below standard evaluations are also the reason that she was permanently laid off. Although no company policy existed concerning lay-offs, this was a particular problem to the plaintiff as there were no Blasting Administrator positions at other mines available. Larry Pile testified that when deciding who should be laid off during a RIF the company attempts to keep the most qualified, versatile and best performing employees it can. The plain-

tiff's duties were primarily record keeping and she clearly had a problem keeping the records up to date. Other than her clerical skills and training and experience as a drilling and blasting administrator she had no other mining qualifications, and as such, plaintiff did not possess transferrable skills. Dan Laning, Manager of Community Affairs, testified that the plaintiff's record keeping was not up to par and that he would rate her last in that skill among all the drilling and blasting administrators. Culler testified that the plaintiff had a bad attitude and poor work habits. Dougherty testified that her work was unacceptable and that in 1980 she was six (6) to eight (8) weeks behind in her records. Smith & Nelson were both unhappy with her record keeping. AMAX had a legitimate concern, as expressed by its officers, that it would receive a notice of violation or a cessation order from the regulatory authorities if the records were not up to date. As such, AMAX legitimately chose to terminate the plaintiff's employment.

Finally, for the reasons above, the Court finds no merit in plaintiff's claim that the defendant is refusing to give her a good recommendation due to her sex. JUDGMENT is entered for the DEFENDANT.

IT IS SO ORDERED.