Kenneth E. **WILLIAMS,**
Plaintiff/Appellee,

v.

**MAREMONT CORPORATION,**
Defendant/Appellant.

No. 86–1263.

United States Court of Appeals,
Tenth Circuit.

May 23, 1989.

ance).

Margaret Stockwell (Benjamin E. Stockwell with her on the brief), Stockwell Law Offices, Norman, Okl., for plaintiff/appellee.

Gerald D. Skoning (Thomas J. Piskorski with him on the briefs), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant/appellant.

Before HOLLOWAY, Chief Judge, ANDERSON, Circuit Judge, and SAFFELS,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Kenneth E. Williams was fired from his job as a general foreman at the Chickasha Plant of Maremont Corporation following a sexual harassment charge against him. Specifically, one male and three female employees signed statements asserting that while on company time and property, and in view and hearing of those employees, Williams pulled down the zipper of his pants. Def. Exs. E, F, G, and H. One statement further asserted that at that time Williams said "if you want it here it is." *Id.,* Def. Ex. F. That statement was confirmed at trial by others. R. Vol. III at 118. Another statement referred to an occasion around the same week when Williams allegedly said "he would f___ right out here at Maremont for $50.00 cause nothing would embarrass him." Def. Ex. E. At trial Williams denied pulling his zipper down but admitted that "I reached down towards my belt buckle and fly, or whatever, you know, that area," R.

* Honorable Dale E. Saffels, United States District Court, District of Kansas, sitting by designation.

Vol. II at I–22, and "said something to the effect, here it is, or try it, or something." *Id.* at I–53. He partially excused his action by explaining that the incident occurred while he was joking with a female employee, Tina Park, whom he used to date, and who had teased him about being too old to "get it up." *Id.* at I–22. The employees who signed the statements were close by Williams but not part of the immediate conversation between Williams and Park. R. Vol. II at I–137, I–157, I–159; R. Vol. III at 63, 75. Williams did not regard his conduct as sexual harassment, R. Vol. II at I–48–49, but, as indicated by the following exchange during his direct examination at trial, he knew it was wrong:

> "Q. What do you feel was the most that should have happened to you for whatever it was you did?
>
> A. I felt like I ought to have been disciplined, because I, you know, I knew it was wrong, and I knew it was a dumb stupid thing to do after I done it. At the time, you know, under the circumstances, you know, it was a joking thing, deal, and then after I done it, I knew, you know, I had done wrong, and I felt like I ought to be disciplined."

R. Vol. II at I–49.

Following his termination Williams sued Maremont for "wrongful discharge." R. Vol. I, Tab 30, para. 2. He contended, among other things, that the Maremont employee handbook distributed to hourly personnel at the Chickasha Plant constituted a contract in which, in effect, Maremont promised not to discharge any employee, management or hourly, for a single instance in one year of any one of twenty-three work rule violations, set forth in the handbook. Violation 21 was: "Threatening, intimidating, coercing, using abusive language, or harassing any employee on company premises." Pl.Ex. 3 at 37. Williams argued that sexual harassment fell within that rule. The handbook provided that an infraction under rule 21 resulted in a maximum of six disciplinary points.

Termination was based on an accumulation of eight points.[1]

The district court ruled that Williams' "cause of action sounds in tort and thus the typical types of damages recoverable in tort actions are potentially recoverable in this action." R. Vol. I, Tab 17 at 11 (Order of December 10, 1984). Consequently, in addition to back pay and insurance benefits, and front pay and insurance and retirement benefits, the court allowed Williams to seek recovery for alleged damage to his reputation, and punitive damages. Following a two-day trial a jury awarded Williams $750,000 in "actual damages" and $250,000 in punitive damages.

Maremont appeals the jury verdict and judgment entered on that verdict, and the district court's denial of Maremont's timely motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. It contends here, as it did in the district court: (a) that the employee handbook in question, specifically the disciplinary point system, did not apply to salaried, supervisory employees such as Williams; (b) that the jury's verdict was unsupported by the evidence because Maremont had an explicit sexual harassment policy, the violation of which was grounds for discharge, and that Williams violated that policy; (c) that the district court erred in excluding evidence of other instances of sexual misconduct on the job by Williams, and erred in its instructions as to the burden of proof; and (d) that numerous errors were committed with respect to the damages. Upon consideration of the record in the light of new guidance from the Oklahoma Supreme Court, we reverse.

## I.

During the pendency of this case on appeal the Oklahoma Supreme Court decided two important cases which bear on the issues under consideration: *Hinson v. Cameron*, 742 P.2d 549 (Okla.1987), and

---

1. Since the Maremont Employee Handbook forms the basis of this case, the section in question is set forth in its entirety as an appendix to this opinion.

*Burk v. K–Mart Corp.*, 770 P.2d 24 (Okla. 1989).[2]

Hinson, a nurse's assistant at the Comanche County Hospital, was terminated for not following orders. She sued the hospital on both tort and contract grounds, asserting that the order in question was never given and that the employee manual, which "constitutes a part of her employment contract with the hospital protects her from discharge absent good cause." *Hinson v. Cameron*, 742 P.2d at 551. The Oklahoma Supreme Court framed the questions on appeal, and their disposition as follows:

> Two questions are presented on certiorari: [1] Did an at-will employee, dismissed for her failure to perform an assigned duty, state a cause of action in tort for wrongful discharge from employment? and [2] Did the employee manual alter an at-will relationship between the plaintiff and her employer? We answer both questions in the negative and reinstate the trial court's summary judgment for the defendants.

*Id.*

The court, in *Hinson,* observed that the general rule permitting termination of "at-will" employment without liability has been modified in various states by three exceptions: "(a) public policy tort, (b) tortious breach of an implied covenant of good faith and fair dealing and (c) implied contract that restricts the employer's power to discharge." *Id.* at 552. It then noted that no public policy consideration was involved in Hinson's case; and, with respect to the tort action based on the implied covenant of good faith theory it said:

> Assuming there may be an implied covenant of good faith and fair dealing in every at-will employment relation, that covenant does not operate to forbid employment severance except for good cause. The court's adoption of a contrary view would "subject each discharge

to judicial incursions into the amorphous concept of bad faith."

*Id.* at 554.

The court then turned to the issue of an implied contract arising from an employee manual, and found that Hinson had not made out a claim sufficient to survive summary judgment under an implied contract theory.

In *Burk* the Oklahoma Supreme Court directly addressed the question left open in *Hinson:* whether in Oklahoma, there is an implied obligation of good faith and fair dealing in reference to termination in every employment-at-will contract. It concluded that in Oklahoma, with the exception of a very narrow class of cases where discharge is contrary to a clear mandate of public policy, "there is no implied obligation of good faith and fair dealing in reference to termination in any employment-at-will contract." *Burk v. K–Mart Corp.,* at 29.

The court recognized the public policy exception as an action in tort, noting that in Oklahoma torts may arise in the course of performance of a contract. However, the court appeared to take a narrow view with regard to circumstances under which a tort cause of action could arise in an employee discharge context. It construed *Hall v. Farmers Insurance Exchange,* 713 P.2d 1027 (Okla.1985), a widely quoted decision of that court, as a case falling within the public policy exception because the employer in that case, an insurance company, was seeking to avoid the payment of benefits already earned (renewal premiums). The *Burk* court also observed that in *Hinson* no tort cause of action existed "because the plaintiff was suing her employer for damages other than *earned* income and the legal relationship dealt with that of master and servant, not principal and agent as in *Hall.*" *Burk v. K–Mart Corp.,* at 27 (emphasis added).

There are differences between the case before us and the cases of *Hinson* and

---

2. We postponed the disposition of this case until after the Oklahoma Supreme Court decided *Burk,* which was under advisement by the court at the time this case was argued before us. We are bound to apply the most recent statement of state law when deciding cases filed under diversity jurisdiction. *See Southwest Forest Industries, Inc. v. Sutton,* 868 F.2d 352, 354 (10th Cir.1989).

*Burk.* Williams' employment at Maremont was "at-will" in the sense that it was of indefinite duration. *See Id.* at 26; *Hinson v. Cameron,* 742 P.2d at 554. However, Williams' contention is that the employee handbook contractually altered that relationship. He asserts, in effect, that by the handbook Maremont contracted with all Maremont employees not to discharge them except for cause, and expressly contracted with them not to terminate, among other things, for a single instance of sexual harassment (assuming no other disciplinary points on the record of the offending employee). Thus, Williams might argue, for example, that an implied covenant of good faith and fair dealing might still arise in the context of an express contract, or that some facts might be alleged which would support a tort action arising out of a contractual relationship. *See Burk v. K–Mart Corp.,* at 28–29.

Nevertheless, there is nothing about this case which suggests that the Oklahoma Supreme Court would recognize a tort cause of action in lieu of or in addition to a cause of action for breach of contract. We believe the tenor of the *Hinson* and *Burk* decisions supports the conclusion that Williams' cause of action, if any, sounds in contract, for breach, and not in tort. Therefore, the proceedings below were in error to the extent that they were grounded upon tort principles. In particular, it was error to award punitive damages and damages for injury to reputation. As the district court implicitly recognized, those

are typical types of damages recoverable in tort actions.[3] R. Vol. I, Tab 17 at 11 (Order of December 10, 1984). Williams concedes in his brief on appeal that they are tort damages. Brief of Plaintiff–Appellee at 15–16. We proceed, then, to analyze the remaining issues on appeal under contract principles.

II.

In *Hinson* the Oklahoma Supreme Court observed that it has not as yet directly addressed whether a personnel manual can constitute a contract enforceable by an employee against the issuing employer. *Hinson v. Cameron,* 742 P.2d at 555. However, citing Oklahoma decisions in *Langdon v. Saga Corp.,* 569 P.2d 524 (Okla.Ct. App.1976), *Miller v. Indep. School Dist. No. 56 of Garfield County,* 609 P.2d 756 (Okla.1980), and this court's decision in *Vinyard v. King,* 728 F.2d 428, 432 (10th Cir.1984) (construing Oklahoma law), the court indicated that certain instances may exist where express or implied contracts might arise from an employer's personnel manual or policy statements. *Hinson v. Cameron,* 742 P.2d at 554–57. For purposes of this opinion we assume that the Oklahoma Supreme Court would treat employers' personnel manuals, handbooks, or other statements of policy as unilateral contracts binding on the employer, under proper circumstances. Many states considering the question have done so.[4]

---

3. *See, e.g.,* Okla.Stat.Ann. tit. 23, § 9 (West 1987); *Fox v. Overton,* 534 P.2d 679, 681 (Okla. 1975).

4. According to one writer, as of 1986 twenty-nine jurisdictions (state and federal) supported enforcement of policy manual provisions. Note, *Limiting the Employment-at-Will Rule: Enforcing Policy Manual Promises Through Unilateral Contract Analysis,* 16 Seton Hall L. Rev. 465, 477 n. 98 (1986). A contrary conclusion, unsupported by a listing of cases addressing the question, is stated by another writer. Note, *Protecting Employees-at-Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv. L.Rev. 1931, 1935 (1983). For comprehensive discussions of the various rationales employed in finding the existence of a contract in such situations *see* Note, *Limiting the Employment-at-Will Rule: Enforcing Policy Manual Promises*

*Through Unilateral Contract Analysis,* 16 Seton Hall L. Rev. 465 (1986); Tepker, *Oklahoma's At–Will Rule: Heeding the Warnings of America's Evolving Employment Law?,* 39 Okla.L.Rev. 373, 387–92, 408–24 (1986); Note, *Employers And Employees: Hinson v. Cameron: Dimming the "Hall Light" on Oklahoma's "Revised" Employment-at-Will Doctrine?,* 41 Okla.L.Rev. 314, 323–26, 336–37; Note, *Employee Handbooks and Employment-at-Will Contracts,* 1985 Duke L.J. 196. *See generally* Note, *"Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith,"* 93 Harv.L.Rev. 1816, 1820–21 (1980); Dertouzos, Holland & Ebner, *The Legal and Economic Consequences of Wrongful Termination,* 3602 RAND Inst. for Civ. Just. 1, 6–7 (1988). Representative cases are digested at 12 A.L.R. 4th 544, 567–73.

As the *Hinson* court noted, provisions in such materials can constitute evidence of the employer's intent to create a contract. *Hinson v. Cameron*, 742 P.2d at 554–55. As a result the provisions can become enforceable promises. The inquiry is essentially one of fact to be resolved by a jury. However, identifying the legal elements which must guide the jury in finding and applying the facts has presented a difficult task. There is general agreement that all the facts and circumstances must be taken into account, and that the promises must be definite, not just vague assurances. Also, traditional notions of mutuality and separate consideration have been altered and are ceasing to be the focal point of inquiry. But the courts are widely divergent in their views on more detailed matters. Variously using both unilateral contract and promissory estoppel principles, the courts have taken different approaches to such things as how the promise must be communicated (in a meeting with the employee? a general distribution? merely by adopting and "publishing" the policy or manual? etc.); the requirement, if any, of the individual employee's actual knowledge of the promise; whether the promise was intended as an inducement; whether it actually operated as an inducement and, if so, whether as to employees generally or each employee in particular; whether specific reliance on the promise by way of continuing to work and foregoing other job opportunities, is a requirement; and so on.[5]

There is no clear guidance on these points in the Oklahoma decisions. In *Hinson* the Oklahoma Supreme Court found that the hospital's employee manual did not contain an implied promise that Hinson could only be dismissed for certain listed reasons. It pointed out that the employee manual only listed examples of some, although not all, grounds for termination. Emphasizing inducement it also said:

"For contractual protection from an at-will discharge Hinson relied below *solely* on the *legal* effect of the *printed text* in the employee manual. Neither of Hinson's two responses to the summary judgment motion identifies some *promissory inducement dehors the manual* as an issue of fact to be tried. Moreover, the evidentiary materials before us give *no indication that the Hospital induced Hinson to accept or to continue her employment by a promised tenure that would shield her from termination except for stipulated causes.*"

*Id.* at 556, n. 28 (some emphasis added).

In *Langdon v. Saga Corp.*, 569 P.2d 524 (Okla.Ct.App.1976), the court of appeals determined that certain benefit provisions contained in a personnel manual issued by the employer did constitute a binding contract enforceable by an at-will employee. In reaching that conclusion the court emphasized consent, communication, inducement and reliance as, apparently, necessary prerequisites to the formation of a contract binding on the employer:

"Under Oklahoma law the existence of a contract depends on four elements: (1) competent parties, (2) consent, (3) a legal object, and (4) consideration. 15 O.S. 1971, § 2. *The parties consent must be (1) voluntary, (2) mutual, and (3) communicated.* 15 O.S.1971, § 51.

Turning to our facts, and construing them favorably to the Plaintiff, we find that the Plaintiff was employed at will by Defendant's predecessor and the Defendant. When Defendant *issued* its Personnel Manual *it offered benefits calculated to induce* employees to increase production and remain with the company. The Personnel Manual defines the Defendant's 'corporate creed' and includes as objectives (1) the development of a superior management team, and (2) to assure fair and equitable compensation and personal growth for employees.

Construing Plaintiff's continued employment with Defendant as employment at will whereby either party could terminate the relationship it is still evidence

---

5. For a discussion and review of various authorities analyzing the nature and sufficiency of communication, reliance and similar matters, *see* Note, *Limiting the Employment-at-Will Rule:*

*Enforcing Policy Manual Promises Through Unilateral Contract Analysis,* 16 Seton Hall L.Rev. at 485–86.

that until termination the parties had a contractual relationship. It is possible *to construe* the Personnel Manual *as an offer for a unilateral contract accepted by the Plaintiff's continuing to work for the Defendant and forgoing his option of termination.* Consideration sufficient to support a contract is defined as 'any benefit conferred ... to which the promisor is not lawfully entitled [i.e., forgoing termination].' Where an employee at will forgoes options to refuse future performance *in reliance or in partial reliance on articulated personnel policies of the employer, the employer is bound by those policies* insofar as they have accrued to an employee for performance rendered while they were in effect and have not been excluded or modified by another valid contractual arrangement."

*Langdon v. Saga Corp.,* 569 P.2d at 527 (emphasis added).[6]

Yet, in *Miller v. Indep. School Dist. No. 56 of Garfield County,* 609 P.2d 756 (Okla. 1980), the Oklahoma Supreme Court seemingly held that the mere adoption and general publication of a policy was enough to incorporate that policy into teachers' contracts. Construing *Miller* in *Hinson* the court stated:

"In *Miller* we held that, in disputes involving nonrenewal of a school teacher's contract, a *policy statement adopted* by the board of education providing for written notification of reasons for nonrenewal was incorporated by implication in the teacher's contract of employment."

*Hinson v. Cameron,* 742 P.2d at 555 (emphasis added).

However, we do not consider it necessary in this case to predict which elements the Oklahoma Supreme Court will ultimately require for the formation of a contract in a written company policy situation. It is unnecessary because Williams' claim cannot be supported on any acceptable ground.

▋ Certain facts are important to an analysis of Williams' breach of contract claim. First, his status as an employee at Maremont was changed shortly before the incident in question. He was promoted to the supervisory position of general foreman in January, 1984, R. Vol. II at I–16, and held that position at times relevant to this case. The position is salaried. The female employees who witnessed the zipper incident, although not under Williams' direct supervision at the time, were hourly employees, ranking lower than Williams in the employment hierarchy.

Second, the disciplinary point system upon which Williams relies as a contract, was introduced into the plant on March 5, 1984, as part of a revised employee handbook, less than a month prior to Williams' termination. R. Vol. III at 4–6, 111. The handbook states on the front cover, "Revised 1984." Testimony at trial revealed that the revised handbook was distributed to hourly employees only, at meetings called for the purpose, although copies were generally available in the personnel office. *Id.* at 5–6; R. Vol. II at I–59–60. Williams' testimony is devoid of any assertion that he received a copy of the revised handbook, or that he ever actually saw the new disciplinary point provisions in the revised handbook prior to his termination, or that he had read any part of or even had a copy of the 1984 handbook in his possession. His testimony and all other evidence at trial is equally devoid of any suggestion of "some promissory inducement dehors the manual," or that Maremont "induced [Williams] ... to accept or to continue [his] employment by a promised tenure that would shield [him] from termination" for sexual harassment, except upon the accumulation of eight disciplinary points. *See Hinson v. Cameron,* 742 P.2d at 556, n. 28. Williams admitted that no one ever told him that the manual applied to him as a general foreman, R. Vol. II at I–59, and no superior of his gave him a copy of the revised handbook. *Id.* at I–60. In short, there is no specific evidence which would support a finding of knowledge, induce-

---

**6.** In *Vinyard v. King,* 728 F.2d at 431, n. 7, this court took particular notice of the fact that the employee "was required, after *reading and understanding its contents,* to sign, along with the personnel assistant, the back page of the handbook." (Emphasis added).

ment or reliance. The record also shows that Williams did not even mention the point system to any company official during the events relating to his termination, and evidenced no knowledge of or reliance on that system. R. Vol. II at I-56, I-57. Further, the record shows that no supervisory personnel at the plant had been disciplined under the point system in the handbook.

Third, Maremont had in existence at the time a written policy specifically relating to sexual harassment in the workplace.[7] That policy permitted termination of an offender. The policy was not in the handbook, and had not physically been distributed to employees, but the uncontradicted testimony was that the policy had been posted on the three main bulletin boards at the Chickasha plant prior to any of the events in question. R. Vol. III at 10. Williams denies having seen the policy on any bulletin board, but neither he nor anyone else testified that it had not in fact been posted.

Fourth, the handbook states at page 39 that its contents summarize "in a *general* way the basic policies and personnel practices of Maremont Corporation that affect you and is *not all inclusive.*" Pl.Ex. 3 at 39 (emphasis added). Immediately following the enumerated work rules it states further that "[v]iolations not *specifically*

described in these rules will be handled as warranted by the circumstances of the case." *Id.* at 38 (emphasis added). The handbook also advises employees to read the bulletin boards:

## BULLETIN BOARDS

It is important for you to be well-informed and knowledgable. The Company bulletin boards are an excellent source of information. You should make it a daily routine to read the bulletin boards to be sure you are aware of events and important announcements. *Id.* at 4.

■ In this factual setting the district court instructed the jury on the law as follows:

"In order to prevail on his claim that he was wrongfully discharged, plaintiff must prove the following elements by a preponderance of the evidence:

(1) that the provisions of the employee handbook upon which plaintiff relies apply to plaintiff;

(2) that defendant failed to comply with these provisions when it discharged the plaintiff; and

(3) that plaintiff suffered damages and such damages were directly caused by defendant's actions.

---

7. The company's sexual harassment policy, dated June 4, 1981, was set out on one page, and provided as follows:

SEXUAL HARASSMENT POLICY

I. It is the policy of Maremont Corporation that sexual harassment of employees in the workplace is unacceptable and will not be tolerated. The law provides:

Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Common sources of charges include offensive or abusive physical contact, joking, lewd language, suggesting sexual favors, displaying sexually suggestive objects, pictures, magazines, etc.

II. All employees of Maremont Corporation are expected to avoid any behavior or conduct toward any other employee which could be interpreted as sexual harassment.

III. Appropriate management and supervisory personnel shall take prompt, corrective action when they become aware of sexual harassment. Such action may include discipline up to and including termination of the offending employee or employees.

IV. Any employee who feels that he or she has been the victim of sexual harassment should notify his or her supervisor, department head, Personnel Representative, or the Corporate Director of Compliance at the Corporate Headquarters in Chicago.

---

Chairman, President and Chief Executive Officer
Def. Ex. A (Sexual Harassment Policy).

You are instructed with regard to the first element, that application of the handbook provisions may be found *either* by *express language in the handbook or by defendant's conduct* in creating a situation *whereby plaintiff reasonably believed that these provisions applied to him and justifiably relied on this belief."*

R. Vol. I, Tab 59, Instruction No. 10 (emphasis added).

■ By that instruction the jury could only find that the handbook *"provisions"* *applied* to Williams. No specific mention is made of the work rule in question, or the disciplinary point system. Beyond that the first option open to the jury in instruction no. 10—application of the handbook provisions by the "express language in the handbook"—does not satisfy the requirements of communication, inducement, and reliance suggested by *Hinson* and *Langdon* to be necessary to form a unilateral contract. If, on the other hand, mere "express language" is enough, then certainly the express language of the sexual harassment policy applies and modifies the handbook.[8]

■ The second option—application of the handbook provisions by "defendant's conduct in creating a *situation* whereby plaintiff reasonably believed that these provisions applied to him and *justifiably relied* on this belief"—comes closer, but still fails adequately to tie inducement and reliance to the continuation of employment in any capacity, and especially to Williams' job as general foreman. More damaging, however, is the complete lack of specific and direct evidence necessary to support

any jury finding on that alternative ground. Williams stated that sometime after he hired on with Maremont in 1972 as an hourly employee, he was provided the employee handbook (as then constituted, without the point system upon which he relies). R. Vol. II at I–28. And he made numerous general statements to the effect that he thought "the handbook" applied to him. He also referred to the point system in a general way, but did not connect his knowledge of the point system to any period prior to his discharge. As noted above, there is no direct evidence that Williams was given, had possession of, or had read the 1984 revised handbook and, in particular, the new point system in question prior to his termination. Nor is there any evidence from Williams connecting that handbook and the point system to Williams in his new management job. In fact, the uncontradicted evidence was that no management personnel had been disciplined under that system, even though Williams himself knew of supervisors who had been discharged. R. Vol. II at I–57, I–104–05; R. Vol. III at 8–9, 111. Thus, any finding based on the "reliance" portion of the jury instruction is unsupported by the evidence.

In the absence of proof of the elements necessary to form a contract, no contract has been formed and the relationship is merely one of employment-at-will. *See generally* the discussion in *Doe v. First National Bank of Chicago,* 865 F.2d 864, 871–73 (7th Cir.1989). Under such circumstances *Hinson* and *Burk* would deny recovery.

■ Even if one assumes the existence of a unilateral contract with respect to the

---

**8.** We also conclude that instruction number 11 was in error. That instruction provided:

"You are further instructed that defendant has alleged that regardless of the applicability of the handbook provisions, which defendant denies, that there was in existence at the time plaintiff was discharged a specific policy covering sexual harassment which subjects violators to discipline up to and including discharge.

If you find by a preponderance of the evidence that such a policy existed and that *plaintiff was made aware of its application to him* and that the acts of plaintiff constitute sexual harassment as prohibited by such poli-

cy, then you must find for the defendant and against the plaintiff."

R. Vol. I, Tab 59, Instruction No. 11 (emphasis added). The pivotal element of that instruction was Williams' awareness of the sexual harassment policy. That condition is inconsistent with the first option in instruction no. 10, which would permit application of the handbook provisions based only on the express language of the handbook, without regard to Williams' awareness of the language. The instruction also ignores the sufficiency of communication by virtue of a general publication and posting on the plant bulletin boards.

disciplinary point system, the jury instructions do not charge meaningful consideration of whether the word "harassment" in rule 21 includes the special category of sexual harassment. Maremont issued a separate, specific policy with regard to sexual harassment in 1981, which permitted the immediate discharge of offenders. That policy was posted in the Chickasha plant when the 1984 revised handbook was issued. It is obvious that Maremont did not intend rule 21 to supersede that policy.[9]

Furthermore, it is illogical on the face of it that employees should interpret rule 21 as including the special category of sexual harassment. Such an interpretation would prevent Maremont from firing even management personnel (under Williams' theory of coverage) for the grossest kind of sexual offense or conduct directed toward a female employee. It would group such patently illegal behavior with six point violations such as sleeping on company time (rule 23), and classify them as less serious than such violations as the failure to follow instructions (rule 29), for which eight points can be given and the employee fired. A simple comparison of the various work rules and the points assigned for the violations thereof, signifying severity of the offense, makes it clear that sexual harassment is not intended to be uniformly classified as a six point violation. "Harassment" is a general term. The handbook advises at the end of the listed work rules that "violations not *specifically* described" will be handled as warranted, by the circumstances of the case. The handbook also advises that it only summarizes policies in a general way, and therefore is not all-inclusive. Pl.Ex. 3 at 38, 39. *See* Appendix.

There is a further consideration. Williams was in a supervisory position. That fact alone must serve to put him and any similarly situated employee on notice that higher standards are required of them, and punishment obviously operates on a different level than that applied to hourly employees.

Public policy also affects our construction of this contract claim. Here, public policy operates to require a construction of contract terms in favor of giving the employer broad discretion in its efforts to eliminate sexual harassment from the workplace. In this area of judicially created contracts and contract rights, it is perfectly consistent to impose a rule of contract construction which favors the enforcement of a workplace free from offensive sexual conduct. Furthermore, such latitude in favor of the employer includes the right, within reason, to determine what types of speech and conduct fall within the prohibited category. Maremont's sexual harassment policy included discipline for offensive conduct, including conduct *"which could be interpreted* as sexual harassment." Pl.Ex. A. *See also* n. 7 above. The company did not exceed permissible limits by its evaluation here. Thus, it is of no consequence that Williams himself did not regard his acts as sexual harassment.

Finally, the contract theory must fail even if one assumes that simply by issuing a handbook and periodic revisions Maremont contractually bound itself to every employee who kept on working in reliance thereon. As we noted above, under such an assumption other policies unilaterally adopted and published by Maremont should apply as well. Thus, the company's sexual harassment policy would be included in the disciplinary portion of the handbook by implication. That reasoning is consistent with *Miller v. Indep. School Dist. No. 56 of Garfield County,* 609 P.2d 756 (Okla. 1980).

In summary, we hold that the jury instructions permitting tort damages, and those establishing the requirements for determining whether Maremont contractually bound itself not to fire Williams for conduct which could be interpreted as sexual harassment, were in error. More fundamentally, however, and construing the evi-

---

**9.** Maremont's plant personnel manager testified that the sexual harassment policy is indepen-

dent of the handbook. R. Vol. III at 12.

dence most favorably to Williams,[10] we hold that Williams did not make out a case sufficient to present to a jury on his breach of contract cause of action. The verdict in this case is not supported by either the law or the evidence, and Maremont's post trial motion for judgment notwithstanding the verdict should have been granted. In reaching this conclusion we have considered all the issues raised by the parties, addressing only those deemed by us to be necessary.

### III.

It is clear by the size of the award, and punitive damages, that the jury in this case thought that Maremont acted too severely by terminating Williams for what it must have regarded as a comparatively small event after twelve years of blemish-free service. Unquestionably, Maremont could have disciplined Williams in ways short of discharge, and in doing so made it clear to all concerned that his conduct was absolutely unacceptable, and any other improper speech or conduct would result in immediate discharge. In retrospect, that, perhaps, would have been wisest. But the question is not whether Maremont was unduly harsh in this instance, the question is whether it had the legal right to terminate Williams under the circumstances. We conclude that it did. The judgment entered by the district court is REVERSED.

### APPENDIX

### WORK RULES

Maremont, like other employers, has established work rules. These rules are specifically designed to aid Maremont and our employees in achieving a safe working environment and operational goals to better enhance our competitiveness in the market place, while also creating a consistent and fair method in dealing with violations.

Each work rule is assigned a point value based on the severity of the rule violation. The accumulation of points will result in corrective action according to the guidelines listed:

A. Two (2) points —Verbal
B. Four (4) points —Written
C. Six (6) points —Final
D. Eight (8) points —Termination

In the event formal corrective action becomes necessary, the supervisor will meet with the employee to discuss the infraction. At the conclusion of the meeting, if the employee disagrees with the corrective action, then the supervisor will arrange a meeting between a personnel representative, employee, and supervisor. If the corrective action is upheld at the conclusion of the meeting, then the employee may pursue the Internal Justice Policy (Page 15 Employee Handbook).

All levels of corrective action must be documented, approved by a Personnel Representative, and filed in the individual's personnel file.

Employees who have work rule violations are provided with an opportunity to remove points from their record. This can be accomplished through good performance for specified periods of time. Good performance is defined as no work rules violation according to the table listed below:

| Good Performance For: | Point Reduction | Total Pts. |
| --- | --- | --- |
| 3 Consecutive Months | 1 Point | 1 |
| 6 Consecutive Months | 2 Points | 3 |
| 9 Consecutive Months | 2 Points | 5 |
| 12 Consecutive Months | All Points Removed | All |

---

**10.** With respect to this settled standard of review, we stated in *Hurd v. American Hoist and Derrick Co.,* 734 F.2d 495, 498–99 (10th Cir. 1984):

"Motions for a directed verdict and for judgment n.o.v. are considered under the same standard. Although we have often used differing phraseology to express this standard, we believe that they all have essentially equivalent meaning, which is best summarized by Wright & Miller: 'The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for the party.'" (Citations and footnote omitted).

## WORK RULES

|  |  | PTS |
|---|---|---|
| 1. | Failure to wear required safety equipment | 2 |
| 2. | Failure to report injuries occurring on the job by end of shift | 2 |
| 3. | Horseplay, roaming, loafing, or leaving work station without proper notification while on company time | 2 |
| 4. | Visiting or interfering with others while at work | 2 |
| 5. | Excessive tardiness or absenteeism | 2 |
| 6. | Littering on company premises | 2 |
| 7. | Failure or inability to produce quality, quantity work desired | 2 |
| 8. | Failure to observe parking and traffic regulations on company premises | 2 |
| 9. | False or malicious statements concerning any employee, the company, or its products | 2 |
| 10. | Entering or leaving through unauthorized doors except in case of fires, fire drills, or emergencies without authorization | 2 |
| 11. | Consuming food or drinks in unauthorized areas | 2 |
| 12. | For each wage garnishment over one in a 12 month period | 2 |
| 13. | Causing damage to plant, equipment, or person while operating a hyster/forklift | 3 |
| 14. | Abuse, misuse, unauthorized use, or destruction of Maremont property, tools, equipment or the property of others | 4 |
| 15. | Gambling on company premises at any time | 4 |
| 16. | Solicitation (See Solicitation Policy) | 4 |
| 17. | Operating machinery in an unsafe manner or without safety guards, equipment being utilized properly without authorization | 4 |
| 18. | Smoking while operating lifts, trollies, or Hysters | 4 |
| 19. | Unauthorized use of cameras inside the plant | 4 |
| 20. | Smoking in an unauthorized area | 6 |
| 21. | Threatening, intimidating, coercing, using abusive language, or harassing any employee on company premises | 6 |
| 22. | Clocking attendance transactions for anyone other than yourself | 6 |
| 23. | Sleeping while on company time | 6 |
| 24. | Theft, or willful destruction of property belonging to Maremont or other individuals | 8 |
| 25. | Fighting on company premises | 8 |
| 26. | Possession and/or consumption of alcohol or illegal drugs on company premises | 8 |
| 27. | Deliberately falsifying any records or deliberately giving false information for company records | 8 |
| 28. | Possession of firearms, weapons or explosives on company premises | 8 |
| 29. | Insubordination and/or refusal or failure to follow instructions of supervisor | 8 |
| 30. | Job abandonment | 8 |
| 31. | Failure to submit upon request to a medical examination | 8 |
| 32. | Absence of three days with no call in | 8 |

Violations not specifically described in these rules will be handled as warranted by the circumstances of the case.

NOTE: This point system is designed for permanent employees. New hires and temporaries will be under more stringent guidelines during their evaluation period.

## SOLICITATION

Distribution rules for which an employee not complying will be disciplined or discharged:

A. Solicitation and distribution of literature by nonemployees on Company property is prohibited.

B. Solicitation of any type by employees on Company property during working time is prohibited.

C. Distribution of literature by employees on Company property in non-working areas during working time is prohibited.

D. Distribution of literature by employees on Company property in working areas is prohibited.

E. Threatening, intimidating, coercing or interferring (sic) with employees or supervision at any time is prohibited.

Definition of terms:

A. Non working time—defined as the employee's free time when he or she is not required to be working, such as break periods, lunch periods, before and after working hours, etc.

B. Non working areas—defined such as cafeteria, parking lot, Company grounds, etc.

C. Solicitation as used in this policy is defined as appealing to an employee a) to buy, sell, or trade any items; b) contribute money or services or anything of value for a nonwork related purpose; c) to sign a document in support of a cause.

Violation of this no solicitation, distribution of literature rule is very serious, and any violation of this rule will result in disciplinary action up to and including discharge.

## COMPLETE DETAILS

This handbook summarizes in a general way the basic policies and personnel practices of Maremont Corporation that affect you and is not all inclusive. Any inquiries you may have concerning any policy should be directed to your foreman or the Personnel Department.

Maremont Corporation Employee Handbook (Revised 1984) (Pl.Ex. 3 at 35–40).