Brenda L. JENNINGS, Appellant,

v.

MINCO TECHNOLOGY LABS, INC., Appellee.

No. 3–88–024–CV.

Court of Appeals of Texas, Austin.

Jan. 18, 1989.

Rehearing Denied Feb. 22, 1989.

James C. Harrington, Texas Civ. Liberties Union Foundation, Austin, for appellant.

Thomas P. Groce, Wendy Kendall Schaefer, Blazier, Rutland & Lerner, Austin, for appellee.

Before POWERS, GAMMAGE and ABOUSSIE, JJ.

POWERS, Justice.

Brenda L. Jennings sued her employer, Minco Technology Labs, Inc., for declaratory and injunctive relief to restrain the company from testing its employees, by urinalysis, to determine if they had recently consumed illegal drugs. The company counterclaimed for declaratory relief that its plan was lawful. Following a bench trial, the court below declared the company's plan "lawful and enforceable," denied Jennings any relief, and awarded the company attorney's fees. Uniform Declaratory Judgments Act, Tex.Civ.Prac. & Rem. Code Ann. §§ 37.001–.011 (1986). Jennings appeals. We will affirm the judgment.

## THE CONTROVERSY

Sixteen months after Jennings began her employment, the company announced its intention to implement a drug-testing program. Two months after the announcement, the company would begin asking employees on a random basis to give urine samples to be tested, with their consent, for evidence of illegal-drug consumption. Jennings sued in district court for a declaratory judgment that the plan was unlawful, and should be enjoined, because the tests would violate the employees' common-law right of privacy. The company counterclaimed for a declaratory judgment that the plan was lawful. Jennings had prayed for a class-action certification, but this was denied or abandoned in the course of the lawsuit and trial was had on her claim alone.

The judgment below determines that the company's plan is lawful and its application to Jennings will not, in the circumstances, amount to an unwarranted intrusion upon her privacy so as to justify and require the protective injunction she had requested. The judgment rests on numerous findings of fact and conclusions of law. These establish that Jennings is an employee "at will" while the company is a private employer "concerned" about illegal-drug use among its employees, and resulting threats to the company's business and products, the users of its products, and the health and safety of all its employees.[1]

The findings of fact also establish the various features of the plan. The company will ask employees, on a random basis, to give samples of their urine together with written consent to its analysis. The particular method of urinalysis to be employed is highly reliable in detecting evidence of illegal-drug consumption, but it will not disclose any other information about the individual. Should any test reveal evidence of illegal-drug consumption, the company will ask the employee to participate in a rehabilitation program at company expense. An employee might be denied continued employment, however, if he declines to give a urine sample or to participate in a rehabilitation program should that be required of him. The plan contains various safeguards for accuracy, confidentiality, and modesty.

Jennings, on appeal, assigns to the trial-court judgment numerous errors. They fall within two general categories. The first attacks the trial-court determination that the company's plan is "lawful and

---

1. The company employs about 200 persons in processing, packaging, and selling "semi-conductors" or "chips." (The latter word is probably slang.) The "semi-conductors" are incorporated by others into various finished products. Some find their way into the space and defense industries. Others are used in the health-care industry; they are, for example, a component of heart "pacemakers." The "semi-conductors" require careful handling. They are easily contaminated, which affects adversely their functioning, but the contamination cannot be detected easily until they actually fail.

enforceable." The second assails the trial-court award to the company of $45,000 in attorney's fees for the preparation and trial of the case, and an additional $6,000 in the event Jennings takes an unsuccessful appeal. We will not analyze separately each of the many assignments of error; they are necessarily determined in the discussion that follows.

## "AT WILL" EMPLOYMENT AND THE COMMON–LAW RIGHT OF PRIVACY

The parties do not dispute, on appeal, that Jennings is employed by the company on an "at will" basis; that is to say, the employment contract continues between them at their mutual pleasure and either may put an end to it at any time without cause. *East Line & R.R.R. Co. v. Scott*, 72 Tex. 70, 10 S.W. 99 (1888). It necessarily follows that "either party may impose modifications to the employment terms as a condition of continued employment." *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 229 (Tex.1986). To be incorporated into the employment contract, however, any modification (such as the company's plan) requires the assent of both the employer and employee. "Generally, when the employer notifies an employee of changes in employment terms, the employee must accept the new terms or quit. If the employee continues working with knowledge of the changes, he has accepted the changes as a matter of law." *Id.*

Jenning's suit implies unmistakably that she does not wish to accept the modified terms of employment proposed by the company; it is not clear whether she will reject the proposed modification and "quit." She sues, however, on a premise that she is not, or should not be, limited to the two choices that *Hathaway* explicitly allows. She contends, instead, that she is entitled as a matter of law to *continue* in her employment *without* assenting to the proposed modification in employment terms; indeed, that she may continue in her employment over the company's *objection* to an employment contract on that basis. Her suit amounts to an action to *compel* specific performance of her "at will" contract according to its *original* or *unmodified* terms, an anomaly if not a contradiction in legal principles.

Jennings rationalizes her extraordinary claim on the following theory, wherein she orchestrates her right of privacy and her contract rights as both are defined and qualified in the common law of Texas: (1) her privacy interest will suffer an unwarranted invasion if the company is allowed to implement its plan, owing to the very nature of the plan, various defects in it, a want of any real justification for it, and to the absence of any considerations that outweigh her common-law right of privacy; (2) the State may, in the public interest, regulate and qualify all employment contracts; (3) specifically, a Texas court may, when necessary to effectuate an important public policy, modify existing common-law precepts pertaining to "at will" employment contracts, as was done in *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex.1985); and (4) the trial court erred when it declined to modify those precepts to secure her continued employment by the company, free of any obligation to submit to the drug-testing plan and the accompanying invasion of her privacy. We reject the theory.

Jenning's common-law right of privacy is undeniable, and the company's plan obviously portends an invasion of her privacy interest. She points out, correctly in our view, that privacy is an essential aspect of any tolerable way of life, and it is put at grave risk by technological advances working with popular acceptance of incremental, almost insensible, reductions of the privacy right to achieve salutary objectives—the control or elimination of illegal-drug consumption, for example. To concede as much does not, however, determine Jenning's case because she seeks to use her privacy right offensively and not defensively. We must deal instead with her claim that her common-law right of privacy *enlarges* her *contract* rights and diminishes those of the company, compared to what each would ordinarily have under the common law of the State that pertains to the making, interpretation, and enforcement of contracts.

In the present case, the particular privacy interest at stake is Jennings's right to be free of any unwarranted intrusion into her private affairs. *See Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 682 (Tex. 1976). The heart of this privacy interest is the individual's exclusive prerogative to determine when, under what conditions, and to what extent he will consent to divulge his private affairs to others. When he elects to do so, his privacy interest is invaded, of course, but the invasion does not constitute a legal wrong because his prerogative was secured to him and he exercised it as he saw fit. For example, his consent amounts to an absolute defense in any tort action based upon the invasion, Restatement (Second) of Torts § 583 (1977); and in a criminal case his self-incriminating testimony would not be excluded, for the Fifth Amendment protects only against compulsory or non-consenting self-incrimination. Jennings's privacy interest, her common-law right, and the public policy they symbolize, necessarily include this essential element of consent. None of them are complete, or even intelligible, without it. We must view Jennings's privacy claim with that understanding.

Jennings's argument turns predominantly on her interpretation of the Supreme Court's decision in *Sabine Pilot,* and the use she would have us make of it. In that decision, the Court created a new common-law cause of action: an "at will" employee may recover money damages from an employer who discharged him solely because he refused to perform an illegal act. *Sabine Pilot,* 687 S.W.2d at 735. The Court reasoned that the new cause of action, for "wrongful discharge," was necessary to secure obedience to the criminal statutes of Texas and the United States; that the "at

will" employment relation had not been immune from *legislative* qualification designed to effectuate other public policies; that the circumstances leading to the *Scott* decision, almost 100 years earlier, had changed over time in unspecified particulars; and that the Court was logically free to "amend," by a "very narrow exception," a doctrine that was "judicially created" in the *Scott* case.[2]

Jennings contends, in substance, that the trial court erred, and we will err, in not extending *Sabine Pilot*—that we must or should create *another* exception to an employer's general right to put an end to an "at will" employment contract for any or no reason. She contends the State's public policy in favor of the right of privacy is transcendingly important; and the common-law precepts pertaining to "at will" employment contracts must be modified to effectuate that policy, at least to the extent that an employer may not terminate the contract solely because an employee declines to consent to a drug test like that proposed by the company. *Sabine Pilot* does not support the argument.

The opinion in *Sabine Pilot* does not purport to be an obituary for the "at will doctrine." Instead, the opinion plainly assumes, with only the "very narrow exception" created therein, the continued vitality of that doctrine as controlling the rights of the parties to an employment contract when they have not fixed any particular duration for the employment relation. One may not reasonably conclude otherwise in light of the Court's more recent decision in *Hathaway;* but the language of *Sabine Pilot* implies the same thing in any event.

◼ *Sabine Pilot* implies, without any doubt, that lower courts are not licensed in that opinion to modify the Supreme Court's

**2.** Any employment relation between free individuals requires, invariably, an express or an implied contract. The "at will doctrine" of *Scott* is no more than a rule of contract construction and the legal consequences that follow that construction. The doctrine was "created" in *Scott* only in the sense that the Supreme Court of Texas was there required, evidently for the first time, to construe an employment contract where the term of service was left indefinite in

the parties' contract. The Court followed the "inflexible" American rule, which was the same as the civil law, "that a general or indefinite hiring is *prima facie* a hiring at will," and a contract for any period of time must be established by proof. Wood, Law of Master and Servant § 136, at 283 (2d ed. 1886); *see also,* 1 Labatt, Master and Servant §§ 156-63, at 504–525 (2d ed. 1913).

earlier decision in *Scott*—that lower courts are not free to create additional exceptions analogous to the "very narrow exception" created in *Sabine Pilot* itself. The Court's emphasis on the narrowness of the new exception forecloses any reasonable inference that the precepts of the "at will doctrine" must give way when the advocates of *any* public policy may claim or even show that it is adversely affected by the doctrine. The Court declined to give any guidance to lower courts in creating or enforcing additional exceptions—how, for example, any eligible public policy might be identified or defined to serve as a basis for an additional exception to *Scott* and the "at will doctrine," or how such a policy should be appraised and measured against competing public policies (including those served by the "at will doctrine" itself) in arriving at a decision to create or not an additional exception.[3] Other impediments to such an interpretation of *Sabine Pilot* suggest themselves, but we need not belabor the point. Notwithstanding the allure (and complexities) of judicial lawmaking, there is such a thing as *stare decisis* applicable to trial and lower appellate courts. The Supreme Court would have given clearer indications of its intention had it really meant in *Sabine Pilot* to free lower courts of their duty to obey the rule of contract

**3.** As a legal precept that fixes the construction and legal effect of a contract having an unspecified duration, the "at will doctrine" implies nothing very remarkable. *Some* legal meaning and effect must be given such a contract.

Jennings does not, however, regard the doctrine as a mere legal precept of contract construction. Instead, she views the "at will doctrine" quite differently: it is a monster having a lawful face and a wicked heart.

Jennings argues, without attempting to establish, that modern conditions enable employers generally to impose, through contracts of adhesion, the "at will" employment relation. Having then the legal right to terminate the relation "for any or no reason," employers use the right to coerce employee submission to degrading work conditions, such as the invasion of privacy feared by Jennings. If not a universal experience by all employees in the State, it is sufficiently common to justify a modification of the common law in order to secure social and industrial justice for all employees. *See generally,* Decker, *"The At–Will Doctrine: A Proposal to Modify the Texas Employment Relationship,"* 36 Baylor L.Rev. 667 (1984); Brunn, *"Privacy and the Employment Relationship,"* 26 Hous.L.Rev. 389 (1988).

The Texas Legislature has not been unresponsive to similar requests for modification of the common law: an employee may not be discharged for reasons of race, color, handicap, religion, sex, national origin, age, union membership, filing a worker's compensation claim, jury service, or military service. Tex.Rev.Civ. Stat.Ann. art. 5221k, § 5, art. 5207a, § 2 (1987) and art. 8307c (Supp.1989); Tex.Civ.Prac. & Rem.Code Ann. § 122.001 (1986); and Tex.Gov't Code Ann. § 431.006 (Pamp.1988). Jennings's suit implies, however, that the legislative process is *inadequate,* for some unspecified reason, to determine the reality of her general presuppositions, and to fashion by statute the needed remedy. Accordingly, she prays that these be done in the judicial process and in her suit specifically.

The judicial process appears, for various reasons, to be ill-suited for the purpose. For example, it lacks the facilities necessary to determine with a reasonable degree of accuracy the reality and extent of Jennings's presuppositions, and for devising an effective, efficient remedy without unintended adverse consequences. The judicial process has been used for the purpose, however, by the creation of causes of action for "wrongful discharge," at common law, when an "at will" employee is discharged: (1) in retaliation for refusing to commit an illegal act; (2) for exercising a vested statutory right; or (3) for "whistleblowing." *See* Bakaly and Grossman, Modern Law of Employment Contracts Ch. 9, at 115–42 (1983). *Sabine Pilot* falls within the first category, of course, but it cannot apply in Jennings's case for the reasons given in the text of this opinion.

In any event, each of the three categories implies antecedent legislative determinations, of some kind, upon which a court might rely with confidence in further modifying the common law. For example, *Sabine Pilot* modified the "at will doctrine" as a necessary means of effectuating the statutes of Texas and the United States "which carry criminal penalties." *Sabine Pilot,* 687 S.W.2d at 735. The Court would have been far less certain of what the "public policy" of the State actually was had it been called upon to create a cause of action for "wrongful discharge" *in the absence of statutes* that declared the public policy of the State by defining and forbidding specific acts as crimes. That is to say, it is highly doubtful that the Court would have attempted *itself,* to ascertain, define, and fix public policy in the matter of coastal-water pollution, for example, and to specify any acts in that regard which should be deterred by the new cause of action for "wrongful discharge." There is, in addition, a great and obvious difference between creating such a cause of action for "wrongful discharge," on the one hand, and on the other hand the creating of a particular contract relation, without the mutual assent of the parties, to be enforced by all the powers of the State.

law laid down in *Scott:* either party may, without cause, put an end to an "at will" employment contract.[4]

■ We cannot accept Jennings's theory for an additional reason. Jennings's employer threatens no *unlawful* invasion of any employee's privacy interest; therefore it threatens no act contrary to the public policy underlying the common-law right of privacy. The company's plan contemplates, rather, that an employee's urine will be taken and tested only if he consents. The plan therefore assumes, respects, and depends upon the central element of the right of privacy and its attendant public policy: the individual's exclusive right to determine the occasion, extent, and conditions under which he will disclose his private affairs to others. This consensual predicate to any test reduces Jennings's argument to her remaining contention.

■ Jennings contends finally that she is poor and needs her salary to maintain herself and her family. Consequently, any "consent" she may give, in submitting to urinalysis, will be illusory and not real. For that practical reason, she argues, the company's plan *does* threaten a non-consensual, and therefore unlawful, invasion of her privacy. We disagree with the theory. A competent person's legal rights and obligations, under the common law governing the making, interpretation, and enforcement of contracts, cannot vary according to his economic circumstances. There cannot be one law of contracts for the rich and another for the poor. We cannot imagine a theory more at war with the basic assumptions held by society and its law. Nothing would introduce greater disorder into both. Because Jennings may not be denied the legal rights others have under the common law of contracts, she may not be given greater rights than they. The law views her economic circumstances as neutral and irrelevant facts insofar as her contracts are concerned.

We hold the trial court correctly interpreted and applied, as it was bound by *stare decisis* to do, the legal principles of *Scott, Hathaway, and Sabine Pilot.* Jennings may consent or not to any future requirement that she give a urine sample or participate in a rehabilitation program, should either be asked of her; or she may reject further employment on the modified terms proposed by the company. She may not, however, determine unilaterally what the terms of her employment shall be and compel the company to contract with her on that basis against its will. In any case, her privacy interest will not be invaded without her consent, which is to say it will not be invaded by the company unlawfully so as to require and justify the injunctive relief she requested.

## ATTORNEY'S FEES

In various points of error, Jennings assails the award of attorney's fees to the

---

4. Jennings's argument invokes the power of a court to "make" law—to act outside the normal course of adhering to established principles, with the even-handed and predictable administration of justice that results from that normal course. The pejorative metaphor "judicial legislation" describes what a court does in such instances. There can be no question that courts "make" law; the only real issue is about the *proper exercise* of the power.

Courts often "make" law merely through the "interpretation" of precedents, producing almost imperceptible changes in the common law. They may, on the other hand, do so openly, frankly, and expressly by explicitly changing one or more precepts of the common law. But a court's power to do this is not the power to "make" law in the almost unfettered discretion characteristic of the legislative branch of government. The *proper exercise* of the power requires the court to consciously consider and reach decisions on certain underlying issues:

(1) may the new rule or principle be rationalized in terms of the entire body of existing common-law precepts; (2) may the problem be handled more fairly, efficiently, and effectively by another organ of government, such as the legislative department with its far greater methods and facilities for investigating and defining the problem, and fashioning a remedy fitted to the problem; (3) do the inherent characteristics of the judicial process limit its effectiveness in understanding the problem fully, in all its ramifications, and in reaching a proper solution; and (4) will judicial intervention and action adversely affect social and economic stability or security? *See generally,* von Mehren and Gordley, *The Civil Law System,* 1142–61 (1977). Moreover, to secure general and professional stability and confidence, these considerations and decisions should be set out in the text of the judicial opinion of any court that determines to "make" new law.

company under § 37.009 of the Uniform Declaratory Judgments Act. The statute declares that in suits under the Act "the court may award [such] reasonable and necessary attorney's fees as are equitable and just." We may not reverse the trial-court award unless it issued from an abuse of discretion. *Oake v. Collin County,* 692 S.W.2d 454 (Tex.1985). The legal principle embodied in the expression "abuse of discretion" contemplates some *legal error,* committed by the trial court in its award, that *injured* or *prejudiced* Jennings. *Landon v. Jean–Paul Budinger, Inc.,* 724 S.W.2d 931 (Tex.App.1987, no writ). Jennings implies, in her brief, several such errors.

■ Jennings contends there is no evidence that the sums fixed by the trial court were "reasonable" or "necessary." This is incorrect. The parties stipulated that the sums fixed by the trial court were reasonable. The evidence given at trial reasonably supports an inference that the sums were reasonable *and* necessary in terms of the kind and amount of work required, the nature and complexity of the case, and the other factors that enter into any calculation of a proper fee to be charged a client by his attorney. *Id.* at 940.

■ Jennings argues next that the sums awarded were not "equitable and just," as required by the statute, owing to the following factors: (1) Jenning's poor financial circumstances; (2) her good employment history with the company; (3) the decreased social utility of the "at will doctrine" in modern times; (4) the importance of the privacy interest; (5) increasing inroads upon that interest by employers and others; (6) that these inroads should be hindered or stopped in the public interest; (7) an alleged motive of retaliation that moved the company to seek such large sums as attorney's fees; and similar or, perhaps, related factors. We will, for purposes of discussion, assume that each of these factors was indeed legally relevant to any decision by the trial court fixing the amount of attorney's fees permitted under the statute.

Jennings's argument is unfocused relative to the factors she mentions. She contends simply that the sums fixed by the trial court cannot be "equitable and just" owing to those factors. She omits to allow for the trial court's authority and duty to consider *other* legally relevant factors implied in the expression "equitable and just." We refer, for example, to the very important factor that Jennings's unsuccessful lawsuit inflicted upon the company a large financial loss in the form of sums paid its attorneys. Jennings's argument, viewed in the most favorable light, implies at best a contention that the trial court exaggerated unreasonably this factor compared to all the legally relevant factors, including those listed by Jennings. *Id.* at 939–40. But Jennings has not shown, by argument or otherwise, that the trial court failed to assign a proper weight to any of the factors, *inter se* or independently; and we cannot determine from the record, as a matter of law, that the court failed so to do. The record allows no inference as to how any factor should be evaluated or adjusted as against all the others in arriving at a fee that was "equitable and just"; nor does the record allow any inference as to how the trial court actually did evaluate or adjust them. We therefore cannot conclude that the record shows the trial court exaggerated any of them unreasonably so as to commit an "abuse of discretion." *Id.* at 940–41.

■ Jennings's argument permits, in one important respect, an exception to what we have said above. She argues that the company incurred about one-half of its attorney's fees in prosecuting an unnecessary counterclaim. In its counterclaim, the company prayed for declaratory relief that Jennings was an "at will" employee and that the company's testing program was "not in contravention of the Texas constitution, Texas statutory or common law, or the public policy of" the State. These were also the controlling issues in Jenning's suit. The company argues that its counterclaim did not duplicate the controlling issues because the counterclaim "was designed to prevent litigation of this type in the future, since all employees of Minco are of the same [at-will] status as" Jennings. Absent class-action certification, we are unable to perceive any possible ground upon which the other employees, who were not parties

**504**

in the lawsuit, would be bound by determinations reached in Jennings's case. We need not consider the matter further, however, because the record permits no inference that Jennings was prejudiced in the particular we have described. The evidence would have supported a finding that the company had incurred reasonable and necessary attorney's fees, through the trial of the case, in the amount of $97,000. By stipulation, Jennings and the company fixed reasonable attorney's fees at $45,000 for the preparation and trial of the case. Nothing in the record suggests that the reduction did not account for the element of duplication mentioned above. Nor are we able to determine from the record when, in the course of the litigation, Jennings abandoned or was denied the class-action certification she had requested, if that certification ever would have been proper under Tex.R.Civ.P.Ann. 42 (1979 & Supp.1988).

For the reasons given above, we affirm the judgment of the trial court.