**Robert T. GILMORE, Plaintiff–Appellant,**

v.

**ENOGEX, INC., Defendant–Appellee.**

No. 78622.

Supreme Court of Oklahoma.

June 28, 1994.

As Corrected June 29, 1994.

As Revised July 29, 1994.

Arthur R. Angel, Angel & Ikard, Oklahoma City, for appellant.

Hugh D. Rice, H.D. Binns, Jr., Roberta Browning Fields, Rainey, Ross, Rice & Binns, Oklahoma City, for appellee.

OPALA, Justice.

Two questions are presented on appeal: (1) Did an at-will employee, dismissed for his refusal to submit to a random drug test, state a cause of action in tort for wrongful discharge from employment? and if not (2) Did the defendant's employee manual provide contractual protection from the discharge in suit? We answer both questions in the negative.

## I

## THE ANATOMY OF LITIGATION

Enogex, Inc. [Enogex], defendant, a subsidiary of Oklahoma Gas and Electric Co., announced on September 18, 1987 a random drug-testing program [1] [the Program], which was scheduled to begin several weeks later. The Program provides for random urinalysis testing of *all employees* for illegal drug and/or alcohol abuse. Employees who test positive for alcohol and/or drugs would not be discharged if they choose to undergo counseling. Only those employees who either refuse to submit to the test or test positive and refuse to undergo counseling would be fired.

When Robert T. Gilmore [Gilmore], plaintiff, was hired by Mustang Fuel [Mustang] in 1984 as an electrical engineer engaged on an at-will basis, there was no drug-testing program. Enogex acquired Mustang in 1987 and applied the Program to all Enogex personnel, including the former Mustang employees. Gilmore was summoned for an urinalysis test, but objected on the grounds that it was an invasion of his privacy. Although the Program called for employees to give an *observed* urine sample under hospital supervision, Gilmore's reservations about the test prompted Enogex to relax the standard and allow him to give an *unobserved* sample at the hospital. Gilmore rejected this concession and refused to take the test in any form. He was fired on November 19, 1987. In an effort to prove he was not a drug user, Gilmore later went to the hospital conducting the urinalysis for Enogex and voluntarily

submitted to a similar test. His test results indicate the absence of alcohol or illegal drugs in his system.

Gilmore sued Enogex on alternative causes of action—a tort of wrongful discharge from employment or breach of employment contract.[2] He sought damages and reinstatement. In support of each claim he pressed alternative theories of liability. He rested the wrongful discharge claim on a *Burk*[3] tort-based public-policy exception to the at-will employment doctrine, asserting a violation of his right of privacy under (a) the U.S.[4] and Oklahoma[5] constitutions, (b) State statutes[6] and (c) the common law. The breach-of-contract claim is rested upon an implied agreement drawn from the Enogex employee manual.

In support of its summary judgment quest, Enogex asserted that (a) Gilmore is subject to the "at-will termination" rule; (b) no *Burk* public-policy exception protects him from termination; (c) the employee manual does not afford contractual protection from at-will discharge and (d) Gilmore cannot state a claim for violation of his privacy right. The trial court gave summary judgment to Enogex.

## II

## THE PUBLIC–POLICY EXCEPTION TO THE AT–WILL EMPLOYMENT DOCTRINE

■ Employers can discharge at-will employees without recourse, in good or bad faith, with or without cause.[7] There is no

---

1. Random drug-testing programs are those in which an employer informs its employees that they may be compelled to submit to drug testing at any time during their employment, for any reason or for no reason at all.

2. Gilmore also sued Enogex for the tort of intentional infliction of emotional distress caused by its mandatory drug-testing program. This challenge came to be abandoned on appeal by failure of its reassertion in the petition or brief. *State ex rel. Remy v. City of Norman*, Okl., 642 P.2d 219, 222 (1982); *Amer. First Abstract v. Western Info. Syst.*, Okl., 735 P.2d 1187, 1189 (1987); *Hadnot v. Shaw*, Okl., 826 P.2d 978, 981 (1992).

3. *Burk v. K–Mart Corporation*, Okl., 770 P.2d 24, 28 (1989), announced a "limited" public-policy exception to the termination-at-will doctrine.

See *Sargent v. Central Nat. Bank & Trust Co.*, Okl., 809 P.2d 1298, 1300 (1991); *Todd v. Frank's Tong Service, Inc.*, Okl., 784 P.2d 47, 50 (1990).

4. Fourth Amend., U.S. Const. For its terms, see *infra* note 32.

5. Art. 2, §§ 2, 21, and 33, Okl. Const. For the terms of §§ 2 and 33, see *infra* note 20.

6. 76 O.S.1981 § 1. For the pertinent provisions of § 1, see *infra* note 22.

7. *Hinson v. Cameron*, Okl., 742 P.2d 549 (1987); *Burk, supra* note 3, 770 P.2d at 28.

implied covenant of good faith and fair dealing that protects an at-will employment relationship from termination.[8] At-will employees do not have a cognizable cause of action for wrongful discharge unless the claim falls within the narrow class of complaints in which the discharge is *contrary to a clear mandate of public policy* articulated by constitutional, statutory or decisional law.[9] The only exception that allows discharged at-will employees to recover damages from their former employers is the so-called wrongful dismissal based on the public-policy tort. A public-policy breach presents generally a question of law.[10]

Gilmore seeks to rest his claim on two of the five grounds alleged to be actionable [11]— (a) exercising a legal right or interest and (b) performing an act that public policy would encourage or condemn, when the discharge is

coupled with a showing of bad faith, malice or retaliation.

## A.

## *EXERCISING A LEGAL RIGHT OR INTEREST*

■ Gilmore urges that since he has a constitutional right to refuse to submit to the urinalysis test, his dismissal for exercising that right is wrongful. Under Oklahoma's version of modified "at-will" employment doctrine,[12] no discharge is actionable unless it may be characterized as rooted in the "breach of public policy." [13] Within the umbrella of protection extended by *Burk* are *only* those employee activities in which the employer may claim no legitimate stake. In this context of *Burk*, the employer is free to advance any legitimate interests except those which may collide with the employee's rights that are explicitly shielded by law.[14] Gil-

8. *Hinson, supra* note 7, 742 P.2d at 554.

9. *Burk, supra* note 3, 770 P.2d at 28.

10. *Pearson v. Hope Lumber & Supply Co.*, Okl., 820 P.2d 443, 444 (1991).

11. Within the five protected public-policy areas identified in *Hinson* lies an employee's discharge for: (1) refusal to participate in an illegal activity; (2) performance of an important public obligation; (3) exposure of some wrongdoing by the employer; (4) exercise of a legal right or interest and (5) performance of an act that public policy would encourage, or for refusing to do something that public policy would condemn, when the discharge is coupled with a showing of bad faith, malice or retaliation. *Hinson, supra* note 7, 742 P.2d at 552; *Vannerson v. Bd. of Regents of Univ. of Okl.*, Okl., 784 P.2d 1053, 1055 (1990). *See Tate v. Browning–Ferris, Inc.*, Okl., 833 P.2d 1218, 1230 n. 68 (1992), where an employee sued his employer for a racially motivated discharge *in retaliation* for his earlier EEOC (Equal Employment Opportunity Commission) complaint. *Tate* teaches that an employee who brings a common-law tort action for damages occasioned either by a racially motivated discharge or by one in retaliation for bringing a racial discrimination complaint states a common-law claim for tortious employment termination under *Burk* (*supra* note 3, 770 P.2d at 28).

12. The "at-will" doctrine is a departure from the English common law. The latter tradition presumed a hiring for one year. L. LARSON & P. BOROWSKY, UNJUST DISMISSAL, § 2.04 at 2–6 (1989). In the late nineteenth century, courts in the United States began to discard the English formulation and to develop an "American rule". *See*

Feinman, The Development of the Employment at Will Rule, 20 Am.J.L.Hist. 118, 122–23 (1976). The crystallization of an American rule is attributed to Horace Gray Wood, whose 1877 treatise on employment relations (MASTER AND SERVANT, § 134 at 272) states:

> "With us, the rule is inflexible that a general or indefinite hiring is prima facie a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof. A hiring at so much a day, week, month or year, no time being specified, is an indefinite hiring * * * and is determinable at the will of either party * * *."

Under this doctrine employers were able to "dismiss their employee[s] at will, be they many or few, *for good cause or no cause, or even for cause morally wrong*, without thereby being guilty of legal wrong." (Emphasis added.) *Payne v. Western A.R.R. Co.*, 81 Tenn. 507, 519, 520 (1884), overruled in part by *Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134 (1915).

13. *Burk, supra* note 3, 770 P.2d at 28. The at-will immunity is now modified only to the extent that protection is afforded by the breach-of-public-policy doctrine. The cluster of interests the at-will doctrine encompasses may be advanced with impunity so long as they remain out of a collision course with the rights protected under the public-policy rubric. In short, the employer's dismissal policy remains uncircumscribed except as it is restricted by the breach of public-policy doctrine. *Id.*

14. For this protected public-policy area—the employee's exercise of a legal right or interest—*Hinson* cites two examples of wrongful dis-

more's refusal to submit to the requested urinalysis does not fall within the doctrine's protected category.

Employers have a legitimate interest in maintaining a work force free from the adverse effects of illegal drug and alcohol abuse.[15] Safety issues and other concerns for efficiency prompted Enogex to take steps to ensure that its employees are neither intoxicated on the job nor performing under par because of off-duty drug and alcohol abuse. The means employed by Enogex' drug-testing policy, though perhaps intrusive, appear reasonably calculated to ensure this legitimate end. By announcing its Program several weeks before the actual testing, Enogex gave its employees an opportunity to cease current drug use so that they would not test positive when the Program was administered. The fact that the Program does not require dismissal of employees who tested positive, should they choose to undergo counseling, would indicate that Enogex intended not to replace its chemically dependent personnel, but rather to maintain a drug-free work environment.

We hold that private employers have a legitimate interest in ensuring an alcohol/drug-free workplace. Where, as here, the employer's program is reasonably designed to achieve that end, at-will employees may have no cognizable claim for wrongful discharge.

charge: (a) dismissal for filing a workers' compensation claim and (b) for supplying information about a fellow employee to local law enforcement authorities. *Hinson, supra* note 7, 742 P.2d at 553 n. 10.

15. Some courts have upheld drug testing in instances where the public safety or the safety of fellow employees is at issue: (a) *Thomson v. Marsh*, 884 F.2d 113 (4th Cir.1989) (the court upheld random drug testing of certain civilian employees at a chemical weapons plant because of the government's interest in safety) and (b) *Jones v. McKenzie*, 833 F.2d 335 (D.C.Cir.1987) (the court upheld drug testing in situations where the employee had direct contact with young school children and was responsible for their physical safety).
The U.S. Supreme Court noted in two drug-testing cases—*Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *Treasury Employees v.*

B.

## THE PUBLIC–POLICY MANDATE

Gilmore asserts that the random drug-test policy is an invasion of his right of privacy. This fundamental right, he asserts, is a recognized public policy, anchored in the constitution, statutes and the common law. Gilmore directs us to the jurisprudence of other states which holds that random drug testing may give rise to a cause of action under the public-policy exception to the at-will employment doctrine.[16] He argues in essence that since random drug testing is an impermissible invasion of his privacy, his refusal to submit to the test is tantamount to refusing to do that which public policy would condemn.

▓ In order for an at-will employee to allege a cause of action for wrongful discharge—i.e., one that is in breach of public policy—two elements must be shown: (1) the employee was fired for refusing to do something that public policy would condemn and (2) the employer was motivated by bad faith, malice, or retaliation when it discharged the employee.[17] The public-policy *exception is a narrow one*. Because of the "vague meaning of the term public policy" its mandate must be tightly circumscribed.[18] Only where there was a violation of clear public policy—articulated by constitutional, statutory or decisional law—will an at-will employee have an actionable claim for wrongful discharge.[19]

*Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)—that the government's legitimate interest in protecting public safety as well as fellow employees from the threat of an impaired employee could justify suspicionless drug-testing of some employees. The same safety concerns could be present in the private sector.

16. Gilmore directs us to *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611 (3d Cir.1992); *Twigg v. Hercules Corp.*, 185 W.Va. 155, 406 S.E.2d 52 (1990); *Taylor v. O'Grady*, 888 F.2d 1189 (7th Cir.1989); *Ga. Assn of Educators v. Harris*, 749 F.Supp. 1110 (N.D.Ga.1990).

17. *Hinson, supra* note 7, 742 P.2d at 552.

18. *Burk, supra* note 3, 770 P.2d at 28–29.

19. *Burk, supra* note 3, 770 P.2d at 28–29. When attempting to find and articulate a clear mandate

### State Constitutional and Statutory Law

■ In support of a state constitutional right of privacy, Gilmore directs us to various provisions in Art. 2 of the Oklahoma Constitution (§§ 2, 21 and 33).[20] Although conceding that the constitutional right of privacy affords protection against *governmental intrusions* and is not enforceable against private individuals or corporations, Gilmore urges that this fundamental-law right may still serve as a clear mandate of public policy to authorize tort recovery against private employers.[21]

Gilmore draws the statutory basis for his right-of-privacy claim from 76 O.S.1981 § 1.[22] The cited statute, he asserts, protects him from an employer's infringement upon any of his rights, including that of privacy. He argues that § 1 affords him a tort claim separate and apart from his alternative breach-of-contract and wrongful discharge claims. We reject this notion.

When Gilmore's alleged cause of action arose no clear mandate of public policy was in existence, either in Oklahoma constitutional or statutory law, which would restrict Enogex' right to discharge an at-will employee for refusing to participate in its mandatory drug-testing program. Although our statutes provide a great variety of regulatory remedies for various forms of wrongful discharge,[23] at the time of Gilmore's dismissal the Oklahoma Legislature had not yet enacted a statute regulating drug testing by private employers.[24] In the face of the law's stony silence, we will not today imply the presence of a public-policy mandate that would prohibit a private employer from discharging an at-will employee for refusing to submit to drug testing.

of public policy, we look to the letter or purpose of a constitutional, statutory or regulatory provision. *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625, 631 (1982). *See Hinson, supra* note 7, 742 P.2d at 552–553; *Petermann v. International Brotherhood of Teamsters*, 174 Cal. App.2d 184, 344 P.2d 25, 27 (1959).

20. The terms of Art. 2, § 2, Okl. Const., are:
"All persons have the inherent right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry."
The terms of Art. 2, § 33, Okl. Const., are:
"The enumeration in the Constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people."
Gilmore notes that Art. 2, § 21, Okl. Const., represents the State's counterpart of the Fifth Amendment's protection against self incrimination.

21. Gilmore relies on expressions in *Burk, supra* note 3, *Smith v. Farmers Co-op Assn. of Butler*, Okl., 825 P.2d 1323 (1992), and *Pearson, supra* note 10, that public policy could be drawn from constitutional law. He notes that some other jurisdictions indicate a willingness to find public-policy protections in other areas: *Luedtke v. Nabors Alaska Drilling Inc.*, 768 P.2d 1123, 1130 (Alaska 1989) (the court held there is a public policy supporting the protection of employee privacy and that its violation by an employer may give rise to the level of a breach of the implied covenant of good faith and fair dealing; because there was a competing public concern for employee safety, the court held that the employer's actions did not breach the implied covenant); *Ring v. River Walk Manor, Inc.*, 596 F.Supp. 393, 396 (D.Ct.Md.1984) (the cause was remanded for a determination whether an employee's retaliatory discharge for speaking to union organizers violated Maryland's public policy).

22. The pertinent terms of 76 O.S.1981 § 1 are:
"Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."

23. *See, e.g.*, 40 O.S.1991 § 199 (discharging an employee for filing a complaint with either his employer or the Commissioner of Labor about hour and safety violations is a misdemeanor punishable either by fine or imprisonment, or both); 38 O.S.1991 §§ 34 and 35 (an employer who discharges an employee for absence owing to the latter's grand jury service is civilly liable for actual and punitive damages; such conduct is also punishable in a criminal misdemeanor prosecution); 44 O.S.1991 § 208 (an employer is subject to fine or imprisonment, or both, for employee's discharge because of the latter's absence for military service); 85 O.S.1991 §§ 5–7 (retaliatory discharge provisions in the Workers' Compensation Act); 25 O.S.1991 §§ 1101 et seq. (a regulatory act prohibiting an employer's discriminatory acts toward, or discharge of, a person because of race or color; the act proscribes retaliation for challenging discriminatory practice; the Human Rights Commission is charged with enforcing this law; the Commission's affirmative action order may include the hiring or reinstatement of an employee with back pay).

24. The Oklahoma Legislature enacted the Standards for Workplace Drug and Alcohol Testing Act, 40 O.S.Supp.1993 §§ 551–565, eff. June 10, 1993, which regulates employer-mandated testing programs. Because this law was enacted *after* Gilmore's alleged cause of action arose, it has no legal effect on his claim or on this appeal.

### Common–Law Invasion of Privacy

Gilmore contends that the common-law tort of invasion of privacy by intrusion upon his seclusion constitutes a source for a clear public-policy mandate. He asserts that Enogex invaded his privacy when it demanded that, as a condition of his continued employment, he undergo a random drug test.[25] According to Gilmore, the unreasonableness of this intrusion is rested on several grounds: (1) Enogex' pledge to respect the privacy of its employees,[26] (2) the absence of any reasonable suspicion that Gilmore was using drugs, (3) the lack of any demonstrated special need for the drug test; (4) the random drug testing of employees and (5) the fact that the Program allows admitted drug users to retain their jobs while requiring employees who refuse testing to be discharged, even those who do not use drugs.

Oklahoma recognizes the common-law tort of invasion of privacy by intrusion upon one's seclusion.[27] In order to prevail on this claim, Gilmore had to prove the two elements of that tort: (a) a nonconsensual intrusion (b) which was highly offensive to a reasonable person.[28] Enogex argues that Gilmore has failed to meet both elements of this test. Because the Program allowed the taking of a urine sample only with an employee's consent, Enogex urges, Gilmore has failed to show a *nonconsensual* intrusion.[29] Enogex also urges that Gilmore has equally failed in proving the second requirement of an intrusion-upon-seclusion claim—that the invasion be *highly offensive to a reasonable person. He could not show that either the manner or reason for the testing Program was unreasonable.*

We hold Enogex' demand that Gilmore undergo a drug test to continue in his at-will employment status may be viewed as so intrusive by itself as to meet the *nonconsensual* element of this test. *But when Gilmore's privacy concerns are balanced against Eno-*

**25.** Gilmore directs us to *O'Brien v. Papa Gino's of America, Inc.*, 780 F.2d 1067 (1st Cir.1986), in which an employee (discharged after he failed a polygraph test about his alleged drug usage) sued for invasion of privacy, claiming he was forced to take the test under the threat of losing his job. The court affirmed the nisi prius judgment condemning the employer's methods as highly offensive to a reasonable person and an invasion of privacy.

**26.** For a discussion of Enogex' contractual obligation to Gilmore, see Part III, *infra*.

**27.** *Munley v. ISC Financial House, Inc.*, Okl., 584 P.2d 1336, 1339 (1978) (the court adopted the invasion-of-privacy tort by intrusion upon one's seclusion found in Restatement (Second) of Torts, *infra* ); *McCormack v. Oklahoma Publishing Company*, Okl., 613 P.2d 737, 740 (1980); *Eddy v. Brown*, Okl., 715 P.2d 74, 77 (1986). *Munley, McCormack and Eddy* give the guidelines to be followed in handling tort claims for invasion of privacy. *See also Guinn v. Church of Christ of Collinsville*, Okl., 775 P.2d 766, 778 (1989).
Section 652B of the Restatement (Second) of Torts reads:
"§ 652B. INTRUSION UPON SECLUSION. One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

**28.** Some courts have addressed the applicability of a common-law invasion-of-privacy claim to the employer drug-testing programs: (a) *Borse, supra* note 16, 963 F.2d at 615 (the court held that a private employee who alleges that her discharge was related to the employer's substantial and highly offensive invasion of her privacy may have stated a claim for wrongful discharge if the circumstances of the drug test satisfy the requirements of the tortious invasion of privacy); (b) *Twigg, supra* note 16, 406 S.E.2d at 56 (the court analogized the right of privacy enforceable against private employers to the Fourth Amendment's right to be free from unreasonable searches and seizures; it held that a private employer's requirement of a drug test without a reasonable suspicion of drug use or a question of public safety or the safety of others was unreasonable). Other courts have rejected the notion that dismissal for refusal to submit to a drug test violates public policy. *See Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 609 A.2d 11 (1992) (the court upheld the random urine testing of employees in safety-sensitive positions); *Rothweil v. Wetterau, Inc.*, 820 S.W.2d 557 (Mo. App.1991); *Groves v. Goodyear Tire & Rubber Co.*, 70 Ohio App.3d 656, 591 N.E.2d 875 (1991). In *Baggs v. Eagle–Picher Industries, Inc.*, 957 F.2d 268 (6th Cir.1992), the court upheld the private employer's right to use "intrusive and even objectionable means to obtain employment-related information about an employee," including unannounced urine testing of all employees.

**29.** In support of its position, Enogex cited *Jennings v. Minco Technology Labs, Inc.*, 765 S.W.2d 497 (Tex.App.1989), and *Luedtke, supra* note 21.

*gex' legitimate interest in providing a drug-free workplace,*[30] *his invasion-of-privacy* claim fails to meet the law's *highly-offensive-to-a-reasonable-person* test.

Gilmore argues his discharge was coupled with a showing of bad faith, malice, or retaliation. He believes that since it was contrary to public policy, it also was wrongful and in bad faith. His circular argument misses the mark. The motivation for the discharge must exist independently of the actual discharge. Gilmore's statement that he had an excellent relationship with his employer until the Program's adoption seems to negate rather than support an inference that his discharge was done in bad faith or with malice rather than for his refusal to participate. Gilmore would appear to be the type of a person Enogex would want to retain as its employee.

### *Federal Constitutional Law*

Gilmore cites a number of factors in support of the unreasonableness of Enogex' intrusion into his privacy.[31] He relies on a body of case law that regulates governmental actions, thus resting his claim on the assertion that the Program's drug testing invades his constitutional right of privacy and constitutes an unreasonable search and seizure prohibited by the Fourth Amendment to the U.S. Constitution.[32]

■ U.S. Supreme Court jurisprudence upholds, under defined circumstances, mandatory drug testing of employees.[33] Gilmore's claim of abridgment of his constitutional rights must fail because the Fourth Amendment protects only from invasive *state* action.[34] Although Enogex is a subsidiary of a regulated natural monopoly, it cannot be considered a state actor. It is a privately owned and operated pipeline company. The Fourth Amendment prevents private parties from engaging in unreasonable searches and seizures where the private party acts as an instrument of the government.[35] Here, the Program was neither mandated nor conducted by any governmental agency. Enogex alone established and implemented the drug-testing program. Its involvement with the state and federal government is confined to the area of rate regulation and to matters directly related to the operation of its pipelines. This case differs from *Skinner v. Railway Labor Executives Association.*[36] There the Court dealt with federal-government regulations that prevent employees of privately owned railroads from refusing an employer's request for drug and alcohol tests. Absent Enogex' direct, remote or indirect control by the state or federal government, we conclude that it was not a state actor in the Fourth Amendment sense. Without this essential element, any claim of constitutional violation must fail.

**30.** For a discussion of Enogex' interest in providing a drug-free workplace, see Part II(A), *supra.*

**31.** *See* the factors discussed in Part II, *Common–Law Right to Privacy, supra.*

**32.** The terms of the Fourth Amendment to the U.S. Constitution are:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**33.** *Skinner, supra* note 15, 489 U.S. at 614, 109 S.Ct. at 1411; *Von Raab, supra* note 15, 489 U.S. at 665–666, 109 S.Ct. at 1390–1391. These cases isolate four criteria for evaluating drug-testing programs under the Fourth Amendment: (1) the

presence of state action (by either a governmental entity or a private party acting as an instrument or agent of the government); (2) a mandatory drug test; (3) the absence of particularized suspicion; and (4) a compelling state interest in ensuring that employees do not use drugs.

**34.** "[T]he Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative ..." *Skinner, supra* note 15, 489 U.S. at 614, 109 S.Ct. at 1411.

**35.** Whether a private party should be deemed an agent or instrument of the government for Fourth Amendment purposes necessarily turns on the degree of the government's participation in the private party's activities. *Skinner, supra* note 15, 489 U.S. at 614, 109 S.Ct. at 1411.

**36.** *Skinner, supra* note 15, 489 U.S. at 615; 109 S.Ct. at 1411.

In sum, we hold that when Gilmore's claim arose, no clear mandate was present either in the U.S. or Oklahoma Constitution, State statutes or regulations, or in the common law which would characterize his discharge as in breach of public policy.

## III

### THE EMPLOYEE MANUAL AS AN IMPLIED CONTRACT

■ Gilmore urges the employee manual Enogex published and provided for his use creates an implied contract, the terms of which prevent Enogex from intruding into his private affairs by subjecting him, absent any particularized suspicion, to the mandatory drug-testing program. He argues certain provisions in the manual amend the at-will employment relationship to provide contractual protection from discharge. He relies upon the following employee manual provisions: [37]

"The Company *will respect the privacy of its employees* and will involve itself in their personal lives only to the extent that job performance or conflict of interest is involved or where assistance programs are made available on a voluntary participation basis." (Emphasis added).

**37.** The employee manual section, upon which Gilmore relies, states in its entirety:

"Enogex considers its employees our most valuable asset and recognizes our goal to promote their self-fulfillment and well being. It is Enogex's policy to implement equal opportunity for employment and development to all qualified applicants without regard to race, religion, color, sex, national origin, marital status or on the basis of age. Positive actions shall be taken to insure the fulfillment of this policy. Employees are expected to give their total support to this policy.

It is Enogex's policy to maintain a safe, healthy work environment; to require safe facilities and work practices; and to encourage employees to take care of their personal health and safety when away from business premises.

The Company will *respect the privacy of its employees* and will involve itself in their personal lives only to the extent that job performance or conflict of interest is involved or where assistance programs are made available on a voluntary participation basis." (Emphasis added).

**38.** *Hinson, supra* note 7, 742 P.2d at 554–555; *Miller v. Independent School District No. 56, Okl.,*

Oklahoma jurisprudence recognizes that an employee handbook can form the basis of an implied contract [38] if four traditional contract requirements exist: (1) competent parties; (2) consent; (3) a legal object; and (4) consideration. [39] Assuming the presence of these factors and construing the undisputed material facts most favorably to Gilmore, we nonetheless conclude that the cited manual provisions do not give rise to the level of an implied contractual covenant that would afford him protection from the discharge of which he complains. Two limitations on the scope of implied contracts by employee handbook stand identified in Oklahoma's extant caselaw: (1) the manual only alters the at-will relationship with respect to *accrued* benefits—it does not limit prospectively the power of either party to terminate the relationship at any time [40] and (2) the promises in the employee manual which may operate to restrict the employer's power to discharge must be in definite terms—not in the form of vague assurances. [41]

The implied terms and benefits flowing from the cited provisions of the employee manual do not transform the at-will relationship into *one requiring dismissal only for cause*. [42] The employer is clearly left free to

609 P.2d 756 (1980); *see also Langdon v. Saga Corp., Okl.App.,* 569 P.2d 524, 527–528 (1977); *Williams v. Maremont Corp.,* 875 F.2d 1476, 1480 (10th Cir.1989).

**39.** 15 O.S.1991 § 2.

**40.** In *Langdon, supra* note 38, 569 P.2d at 527–528, the Court of Appeals held that an employer's personnel manual providing for certain employee benefits (vacation and severance pay) created a contractual basis for a terminated employee's claim to those benefits. The policy statement incorporated into the personnel manual was a contract defining the employment relationship during the period the policy was in effect. *Hinson* notes that *Langdon* is consistent with *Miller, supra* note 38, where the court held that the board of education's policy statement was incorporated by implication in a teacher's employment contract. *Hinson, supra* note 7, 742 P.2d at 555.

**41.** *Hinson, supra note 7, 742 P.2d at 554–555; see also Williams, supra* note 38, 875 F.2d at 1481.

**42.** *Langdon, supra* note 38, 569 P.2d at 527.

modify its policies prospectively,[43] except only those which affect accrued benefits. Gilmore has not shown that by these contract provisions he was deprived of any benefits which accrued to him under the employee manual. Enogex clearly retained the right to modify prospectively the terms of employment—a power it exercised by announcing the drug-testing program several weeks before its initial implementation. At that point Gilmore was faced with the choice of (a) accepting the *new* terms of employment, knowing he would be required to submit to the drug test, or (b) refusing to participate at the risk of losing employment.

Gilmore's implied contract claim is flawed because the provision in the employee handbook upon which he relies contains no specific terms, but only vague assurances.[44] This court, while willing to imply the existence of a contract and construe the terms, will not imply terms in the context of obscure or ambiguous language.[45] The trial court did not err in refusing to read concrete terms into the murky language of the employee manual and in recognizing that the manual did not limit prospectively the power of either party to terminate the employment relationship.

## SUMMARY

Gilmore, an at-will employee dismissed for refusing to submit to a private employer's mandated random drug-testing policy, failed to state a cognizable demand under the law in force when his claim for a constitution- or statute-based invasion of privacy or wrongful discharge arose. The vague terms of the employee manual upon which Gilmore relies fail to afford him contractual protection from the discharge of which he complains.

Summary judgment to Enogex, which is free from error, is accordingly affirmed.

HODGES, C.J., and HARGRAVE, ALMA WILSON and WATT, JJ., concur.

LAVENDER, V.C.J., and KAUGER, J., concur in result.

SIMMS and SUMMERS, JJ., concur in judgment.

---

43. *Langdon, supra* note 38, 569 P.2d at 528.

44. *Hinson, supra* note 7, 742 P.2d at 556; *see also Williams, supra* note 38, 875 F.2d at 1481.

45. *See Langdon, supra* note 38, 569 P.2d at 528.